CHAMBERS *et al.*, Appellants, v. CITY OF ST. LOUIS, Respondent. *

1. The City of St. Louis, under its charter and the general law concerning corporations, has power to acquire and hold such land beyond the limits of the city as may be necessary for the purposes of the corporation; the right of the city to hold land beyond the city limits is not restricted to the specific purposes mentioned in the second section of the first article of the charter of St. Louis of March 3, 1851.

2. The question whether a municipal corporation, authorized to purchase and hold real estate for certain purposes, transcends the exact limits of its power, and acquires land that it is not authorized to hold for any of the purposes of the corporation, can only be raised and determined in a proceeding instituted at the instance of the state.

3. Municipal corporations may hold property in trust for charitable uses; they may be compelled in equity to administer and execute the trusts imposed upon them.

4. The statute of 43 Elizabeth concerning charitable uses is, it seems, in force in this state.

5. Gifts to charitable uses were valid and binding dispositions previous to the passage of the statute 43 Elizabeth, ch. 4; the law of charities did not derive its existence from said statute. The jurisdiction of courts of equity over charitable uses and devises is not grounded, in this state, upon said statute, but upon the common law.

* The opinion of the supreme court in this case is also applicable to a case brought to the supreme court by appeal from the St. Louis circuit court. The case referred to had its origin in the St. Louis probate court. On the occasion of an annual settlement in that court by the executors of Bryan Mullanphy, the court ordered distribution of the balance in the hands of said executors, and directed one-third part thereof to be paid to the City of St. Louis, and two-thirds to be distributed among the heirs. From this order the heirs appealed to the circuit court, which sustained the order. The heirs appealed to the supreme court.

6. In the year 1849 one Bryan Mullanphy made his last will in the following words : " I, Bryan Mullanphy, do make and declare the following to be my last will and testament: *One equal undivided third of all my property, real, personal and mixed, I leave to the City of St. Louis, in the state of Missouri, in trust, to be and constitute a fund to furnish relief to all poor emigrants and travelers coming to St. Louis on their way bona fide to settle in the west.* I do appoint Felix Costé and Peter G. Camden executors of this, my last will and testament, and of any other will or executory devise that I may leave. All and any such document will be found to be olograph, all in my own handwriting. In testimony whereof witness my hand and seal. [Signed] Bryan Mullanphy (seal)." The testator died in 1851, leaving a large estate, valued at more than a million and a half of dollars, the greater part of which consisted of lands situate in St. Louis county, beyond the limits of the city. The will was duly admitted to probate. *Held,* that the devise was a good and valid devise ; that the City of St. Louis was capacitated to take and hold all the property embraced within the terms of the will upon the trusts therein indicated, and to execute and administer said trusts, subject to the control of a court of equity.

## Appeal from St. Louis Land Court.

This was a suit for partition of the real estate belonging to the estate of Bryan Mullanphy, deceased. Charles Chambers and Jane Chambers his wife were plaintiffs, and Richard Graham and Catherine Graham his wife and others, the heirs of said Bryan Mullanphy, together with the City of St. Louis, were defendants. The petition set forth the will of said Mullanphy and insisted that the devise therein to the City of St. Louis was void, and that the heirs were entitled to the whole estate. The court decided that the devise to the city was valid, and assigned one-third of the real property to the city and two-thirds to the heirs. The greater portion of the real estate embraced in the will is situate in the county of St. Louis and beyond the limits of the city. The heirs appealed to the supreme court. The will is set forth below in the opinion of the court.

*Field & Shepley,* for appellants. Mr. Shepley, in a printed brief, presented the following points :

I. The City of St. Louis is not competent to take the trust attempted to be created by this will, neither the personalty nor the realty. It can not take the realty for, 1st. The pur-

poses for which the city can take and hold any real estate are enumerated in the first article of the amended charter of 1851. The power to receive and hold property within the city is unrestricted in terms, but beyond the city limits it can only take and hold for certain specific objects only, none of which are included in this trust; so that, 2d. The city can not take that portion beyond the city limits, because it is not claimed for any use mentioned in the charter. 3d. If not expressly conferred by its charter, nor necessary for the exercise of the powers given in it, then by the third section of the act concerning corporations any such power is denied. (R. C. 1845, p. 232.) The clause in the general corporation law applies only to cases where land is necessary for the exercise of corporate powers *as land*, and not to hold as a fund to get an income to defray corporate expenses. It can take neither the personalty nor realty, for, 4th. In order to enable the city to take this trust, it must be within the scope of its powers conferred by its charter. This would seem to be obvious enough, as a municipal corporation, as any other corporation, is but the creation of the legislature, with just as much vitality, with just so long a period of existence, and with just such powers and functions, as its creator chose to confer, and no more. (See Vidal v. Girard's Exec'rs, 2 How. 128; in the matter of Howe, 1 Paige, Ch. 214; Jackson v. Hartwell, 8 John. 422; Andrew v. The New York Bible & P. B. Society, 4 Sand. S. C. 185; Ayres v. Methodist Church, 3 Sand. S. C. 351; Ins. Co. v. Ely, 2 Cow. 678; Trustees of N. M. Sem. v. Peaslee, 15 N. H. 317; Greene v. Dewins, 6 Conn. 294, 304; 2 Kent's Com. 279, 280; People v. Utica Ins. Co. 15 John, 383; Angel & Ames on Corp. § 111; Octavia Boyce et al. v. City of St. Louis et al., in the supreme court of New York.) 5th. The subject or the objects of the trust are not within any of the powers conferred on the city by its charter. The delegated powers are specified in the third article of the amended charter. In neither of these are any powers conferred to which this trust can attach. The city is no eleemosynary institution. It was not created to

distribute charities. It has none of the machinery for any such object. The distinction between civil and eleemosynary corporations is important. The case of Dartmouth College v. Woodward, 4 Whea. ——, turned upon it. An eleemosynary corporation implies a contract with the founder, and the corporation is above the power of the legislature to repeal or alter.

II. Even if the trustees could take, yet the trust as declared by this will is so vague, uncertain and indefinite as to be void. It will scarcely be asserted that, if this was the case of an ordinary trust, it could be for a moment maintained; but it is attempted to be supported on the ground that it is a charity, and as such, that different principles apply to such a class of trusts from those that affect ordinary trusts; and it is asserted that both by the statute of 43 Elizabeth, and also by the general powers belonging to a court of chancery, a trust like this is legalized and supported. To this we say—

1st. That before the passage of the 43 of Elizabeth it is certain that, when the objects of the charity could not, like any other *cestui que trust*, come into court and claim the interference of the court, the trust could not be supported. The case of a superstitious use was the only exception. By statute 23 Henry 8, c. 10, the uses therein mentioned were declared to be within the statute of mortmain. Of course the king could have the benefit of them. So the statute 1 Ed. 6, ch. 14, enacted that the uses declared to be superstitious should vest in the king. Perhaps these statutes against superstitious uses were the origin of the royal prerogative to dispose of certain charities by sign manual. By this we mean that, if you admit that charitable trusts existed and could be enforced prior to the act of 43 of Elizabeth, yet they were just such trusts, and *none other*, as could be enforced in cases of ordinary trust. They were either cases where the *cestui que trust* was a corporation, or where the recipients of the bounty were so distinctly pointed out that in their own names they could file a bill to have the trust enforced. (Bap-

tist Ass. v. Hart's Exec'rs. 4 Wheat. 1, 387; 3 Peters' Appendix, 481; Ayres v. Trustees of Meth. Ch. 3 Sand. S. C. 367; Wheeler v. Smith et al., 9 How. 55; Gallego v. The Att'y Gen'l, 3 Leigh, 450; D'Osbriel v. Att'y Gen'l, 5 Harris & Johns. 398; Chittenden v. Chittenden et al., 1 vol. Am. Law Reg. 538, 545; Owens v. Missionary Soc., &c. 14 N. Y. 387, 399.)

2d. The statute of 43 Elizabeth is not in force in this state. Our statute provides that the common law of England and all the statutes and acts of Parliament made prior to the fourth year of the reign of James the First, and which are of a general nature, not local to that kingdom—which common law and statutes are not repugnant to or inconsistent with the constitution of the United States, the constitution of this state, or the statute laws for the time being—shall be the rule of action and decision in this state. This statute is both local to the kingdom and repugnant to our constitution and laws. That statute is of local policy and connected with local establishments. This is sufficiently evident from the act itself. It arose out of the peculiar circumstances in which England was placed by the suppression of the monasteries, and is part of the same system as the poor laws framed at the same time, and which have never been regarded as being in force in America. (See also Witman v. Lex. 17 Serg. & R. 88, 91; Dashiell v. Att'y Gen'l, 5 Har. & Jo. 401-2; Gallego v. Att'y Gen'l, 3 Leigh, 450; 2 Kent's Com. 282, 287; Gray et al. v. Allen et al., 5 Humph. 206.) The machinery with which it acts is no part of our system. It is legislative not upon ordinary or extraordinary powers belonging to a court of chancery, but upon prerogative rights as appertaining to the king, and exercised by the chancellor as his *personal* representative, and therefore can be no part of the law of this state. Our statute adopting the English common law and statutes was borrowed from the Virginia act of 1776. But in Virginia the statute 43 Elizabeth was never in force, and was never expressly repealed. (See proceedings of Committee of Revision, 1789, in the Journal of the House

of Delegates.) In 4 Kent's Commentaries, p. 509, note, it is said "the jurisdiction vested by *the statute of Elizabeth* over charitable uses is said to be *personally* in the chancellor, and *does not* belong to his ordinary or extraordinary jurisdiction in chancery." (See also Story Eq. Juris. § 1188.) The royal prerogative exists in none of the departments of our government. Not in the general assembly, for that possesses only legislative power; and the prerogative is something beyond or without the law, *extra legem.* If this be so, then it is clear that such a statute—which vested a jurisdiction and power over charitable uses in the chancellor as *grand almoner,* as it might have done in the Archbishop of Canterbury as the personal representative of the king—can not ever have been a part of the law of this state. In fact, of all the states of this Union, only in three of them has it been held that the statute of Elizabeth is in force — North Carolina, Kentucky and Indiana. In Massachusetts it has been held to be in force so far as applicable, and as modified by virtue of a colonial ordinance. (Going v. Emery, 16 Pick. 107.)

3d. The law of charitable uses, whether it existed by virtue of the 43d of Elizabeth, or before that time, formed no part of the common law as introduced into this state. (See Going v. Emery, 16 Pick. 107.)

4th. Whether the power over charitable bequests as exercised in England be derived from 43 Elizabeth, or existed prior to the passage of that statute, yet it was exercised as a part of the *prerogative power,* and not as a part of the jurisdiction of a court of equity. In the case of the Baptist Association v. Hart's Exec'rs, 4 Wheat. 1, Chief Justice Marshall, in commenting on the power of the courts of equity in England to enforce charitable bequests, says : " That it is a branch of prerogative and not a part of the ordinary powers of the chancellor is sufficiently certain." In the case of the Attorney General v. Flood, Haynes, 630, it is said, " The court of chancery has always exercised jurisdiction in maters of charity derived from the crown as *parens patriæ.*" In

Fountain v. Ravenal, 17 How. 394, Chief Justice Taney, in speaking of the statute, says: "But this circumstance does not affect the question I am now considering; for, whether exercised *before or not*, yet, *whenever* exercised, it was in virtue of the *prerogative power*, and *not* as a part of the jurisdiction of the court as a court of equity." In Story's Equity Jurisprudence, § 1188, it is said: "The jurisdiction exercised by the chancellor in England, under statute of 43 Elizabeth, is *personal*, exercised as delegate of the crown, and not exercised in virtue of his ordinary or extraordinary jurisdiction in chancery." (See also Chittenden v. Chittenden et al., 1 Amer. Law Reg. 538; Att'y Gen'l v. The Mayor of Dublin, 1 Bligh, New Rep. 312; Moggridge v. Hachwell, 7 Vesey, jr., 63.)

5th. If, then, the doctrine of charitable uses, as exercised by the chancellor in England, either before or after the passage of 43 Elizabeth, is not in force in this state, then charities in this state stand like any other trusts; and when a charitable trust is attempted to be created of so vague and uncertain a character that the *cestui que trusts* can not be definitely and accurately determined, and be able to ask the court to interfere for their protection, this trust, like any other trust, must fail. And this is the only proper and consistent doctrine, and the only rule that will not do more injury than it can produce benefit.

So thought Chief Justice Taney, in Fountain v. Ravenal, 17 How. 395-6. By our constitution, the ordinary jurisdiction of courts of equity only is conferred upon our courts. (See 10th section, 6th art. of Const.)

6th. But even admitting that the court has complete jurisdiction over the subject of charities, as derived either from 43 of Elizabeth or as inherent to its general powers, yet this devise is so vague and uncertain as to the objects of the charity, that it can not be supported without resort to the doctrine of *cy pres*, or, what is the same thing, devising a *scheme*. Let us examine this trust: "*In trust, to be and constitute a fund to furnish relief.*"

How is this relief to be administered? Is it by giving money?—by procuring food?—by furnishing means of transportation?—or in all these modes? The emigrant to Pike's Peak would have his wants best supplied by a set of mining tools. Who are the objects? They are first, "*poor emigrants?*" But emigrants from where? Is it meant emigrants from foreign lands, as the German newspapers insist it is; or does it mean emigrants from other states of the Union? or does include both classes of emigrants? There is another class who are to share in this bounty, to-wit: "travelers." These may be proper objects to bestow charity upon, or they may not. There may be persons "*traveling*" to whom "relief" might not be unwelcome, and yet they may be amply able to supply their own wants. "*Coming to St. Louis, on their way.*" Is it intended that those only who make this city a stage in their journey should be the sharers of this bounty; or is it intended that those who may come here to settle are also included? It would, by the next clause, seem to be only those who are temporarily here. "*Bona fide to settle in the west.*" How can the trustees be satisfied of the good faith of the applicants? It is only those who come in good faith to settle in the west that the bounty is provided for. "The *west!*" Where is it? Where are those persons to settle? Does it include emigrants to Iowa or Wisconsin; or is it confined to Kansas, Nebraska, Pike's Peak? Is the region bounded by the Rocky Mountains, or does it reach to the Pacific? Are the Mormon emigrants included? If this trust is abused by the city, as it most assuredly will be if this trust is sustained, what is the remedy? How is the court to interfere? Who are the persons who shall have the right to seek the interposition of the court? And granting that such a person could be found, and the court did find that the city had departed from the true intent and meaning of the testator in administering the trust, how is the court to interfere so as to protect such rights. Does the court of chancery in the state possess the power to make a scheme for the administration of this char-

ity? In 2 Iredell Ch. 261, the court say that the doctrine that the court can make a scheme for the administration of a charity is no part of our law. If this extraordinary power of the English courts is supposed to belong to our courts, then it is absolutely necessary that they should have the necessary machinery for carrying it into effect. This can only be done by a scheme.

7th. The trust can be supported, in any event, only by resorting to the doctrine of *cy pres;* and that has never been considered as having any foothold in this country. Every court, in every state of this Union, when the question has been presented, has uniformly repudiated the possession of any such power, with perhaps the exception of Indiana. (Moon v. Moon, 4 Dana, 357; McCauly v. Wilson, 1 Dev. Eq. 276; Bridges v. Pleasants, 4 Iredell Eq. 26; Andrew v. The N. Y. Bible Soc. 4 Sand. Sup. 156; Att'y Gen'l v. Wallace, 7 B. Mon. 641; Witman v. Lee, 17 Serg. & R. 93; White v. Fish, 22 Conn. 55.)

8th. The courts of this country and of England have refused to support trusts which were certainly as well defined, to say the least, as the present. (Wheeler v. Smith et al., 9 How. 55; Baptist Ass. v. Hart's Exec'rs, 4 Wheat. 1; Dashell v. Att'y Gen'l, 5 Har. & J. 392; Gray et al. v. Allen et al., 5 Humph. 170; Bridges v. Pleasants, 4 Ired. Ch. 25; Gallego v. Att'y Gen'l, 3 Leigh, 450; Fountain v. Ravenal, 17 How. 395; White v. Fish, 22-Conn. 55; The Phelps' Will case, 28 Barb. 122; Omany v. Butcher, Turn. & Rus. 260, 272; Ellis v. Sully, 1 Myle & Cr. 293; Williams v. Karshaw, 5 Clarke & Fin. 111; Kendall v. Grainger, 5 Beavan, 300; Morrice v. The Bishop of Durham, 9 Ves. 399; Owens v. The Methodist Church, 14 N. Y. 380; Beekman v. The People et al., 27 Barb. 272; Broome v. Yeall, 7 Ves. 50, note; 9 Ves. 406; 10 Ves. 27; Clarke v. Taylor, 21 Eng. Law & Eq. 308.)

9th. To create a fund for the relief or support of foreign paupers is against public policy. It is not our own poor who are proposed to be benefitted. It is not those who have

made their home among us, and have met with misfortune or sickness. It can never be efficacious as a charity, if administered according to the evident intent of the donor. It is to be doled out to those who, on their way to other places, may be supposed to need assistance. Other cities have passed very stringent laws against the introduction of foreign paupers, sending them back to Europe; and others have passed laws to prevent the introduction in their midst of those from other states and towns who were in the same condition. The increase of domestic pauperism is frightful. (See Report of New York Association for relief of the Poor, 1859, p. 17–21.) But here we are to create a fund for this purpose, and say to all those who are on their way to the west, " here, come and eat." Are we to hold out an invitation to all the indigent of the world to come here and have their wants supplied? The result of holding this good will be inevitable. It will be a corruption fund. Unrestricted in its exercise, it will be so managed, both in the offices it creates and the objects it selects, as best to subserve the interests of the party in power.

III. If this trust shall be adjudged by the court to be void, and yet the city is held to be competent to take as trustee, yet, as far as the personal property at least is concerned, the city will not hold it as trustee for the next of kin, but the probate court will at once distribute it to the heirs.

IV. If the court should hold that, though indefinite, this trust was good as a charity if there was a trustee competent to take, and should further come to the conclusion that the city could not take as trustee, then the court would not, as in ordinary trusts, appoint a new trustee. And this for the very good reason that there is no *cestui que trust* to ask for such intervention. If there is a *cestui que trust*, whether it be in the form of a charitable institution or individuals sufficiently well designated as the persons intended as the recipients of the bounty, then the court will appoint a new trustee. It knows with whom it is dealing, and can control and manage it as it will. In the case of a trustee competent to

take, if the court hold that the charity, though indefinite, is not void, it says, the testator has placed his property in a person competent to take, and having his full confidence to administer this trust, provided, perhaps, by him with a plan for administering it. The title to the property has passed. But if the designated trustee can not take, then the court is asked to become an *actor*, to stretch out its arm to *protect* this indefinite trust. In several states this distinction is maintained. (Ayres v. Trustees of Methodist Ch., 3 Sand. S. C. 351, 365–6; Andrew v. N. Y. Bible & P. B. Soc., 4 Sand. S. C. 185–6; Owens v. The Methodist Soc., 14 N. Y. 405–6; Trustees, &c., v. Peaslee, 15 N. H. 317; Trustee v. Hart's Exec'rs, 4 Wheat. 50; Fountain v. Ravenal, 17 Howard, 395.)

*Leonard, Todd, Bay,* (city counsellor,) *Glover & Richardson,* for respondent. The following is the printed brief of Mr. Leonard:

These cases involve two general questions: *First.* Whether the city of St. Louis is capable of taking the legal ownership. *Second.* Whether, if the city be incapable, the present gift is nevertheless valid under our law as a donation to charity.

#### FIRST QUESTION.

In support of the capacity of the city not only to acquire, but also to retain the legal ownership, the following propositions are submitted: *First.* At common law, the capacity to take and hold property, both real and personal, is incident of common right to every corporation; and, by our statute of wills, corporations are made capable of taking land by devise, which was denied to them by the English statutes of the 32 and 34 Henry 8th. (10 Rep. 30; Kyd on Corp. 74; 2 Kent's Com. 281; Ang. & Ames on Corporations, § 145, and cases there cited.) *Second.* The mortmain acts do not disable corporations from taking real property, but only subject the lands that are acquired by corporation to forfeiture at the suit of the state, upon a direct proceeding for that purpose. (Per Wilmot, C. J., in

Lady Downing's case; Wilmot's Opinions, 9, 10.) *Third.*
Our general corporation act of 1845 is a legislative license to
all our corporations, present and future, to hold such real
and personal property as the purposes of the corporation
shall require; and the express provision in the city charter
of 1851, (which was in force when this bequest took effect,)
in reference to the power of holding property (art. 1, § 2) is
a further license to this particular corporation to hold prop-
erty, both real and personal, within the city, unlimited by
the corporate necessities, and without the city for the specific
purposes expressed in the charter; but this provision does
not limit the general statute right, conferred upon all our
corporations, of holding property, no matter where situated,
or of what amount, that the purposes of the corporation may
require. Assuming these propositions to be true—the cor-
rectness of which it is presumed can not be questioned—and
admitting, for the present purpose, that the property em-
braced in the present gift exceeds what the purposes of the
corporation require, still the title passed to the city, and is
lawfully held by the corporation against all persons except
the state, and is only defeasible at the suit of the state, even
for the excess, in a direct proceeding on the part of the state
for that purpose; and the effect of the act of March 12,
1859, is to relieve the city from the forfeiture so far as the
state is concerned. (Leazure v. Hilligas, 7 Serg. & R. 319;
The Banks v. Poitiaux, 3 Rand. 136; Silver Lake Bank v.
North, 4 John. Ch. 373.

### SECOND QUESTION.

Supposing the city to be incapable of taking the legal own-
ership, two general propositions are submitted in support of
the validity of the bequest as a charity.

FIRST PROPOSITION.—By the English law, as it existed be-
fore the 4th of James I, this is a valid appropriation of the
beneficial ownership to the accomplishment of the purpose
expressed in the gift, without any reference to the capacity
or incapacity of the city to take legal ownership; in other
words, it is, under that system of law, a valid donation of the

property to the perpetual relief of that class of the poor of St. Louis that is described in the instrument of gift.

There are two elementary principles in the English law of charities upon which this general proposition rests. The first is peculiar to charities; the other is common to all property trusts, whether ordinary trusts, which are for the benefit of persons, or extraordinary, which are for the accomplishment of some charitable purpose in the legal sense of that term. *First.* That whenever property is given for the accomplishment of a charitable purpose, the application of it to that purpose will be judicially enforced; in other words, that a charitable purpose is a competent *cestui que trust;* and, *Second.* That whenever property is given in trust, the trust is valid, although the trustee appointed be incapable of taking the title.

*First Principle.*—Ordinarily, in all transfers of property, whether of the legal or beneficial ownership, the grantee must be a definite person, either natural or judicial, who is capable of standing in a court of justice and claiming a judicial enforcement of his rights; otherwise the transaction is utterly void on account of the uncertainty of the person to take. It is an exception to this rule in the English, and it is believed in every cultivated system of law, that, when property is given for the accomplishment of a proper public purpose, the application of it accordingly will be judicially enforced at the suit of the government through its appropriate officer. These charitable purposes—*piæ causæ*, as they are called in the civil law of modern Europe, (1 Kaufman's Makeldey, 150,)—are thus, it seems, according to our equity law, capable of taking property given for their accomplishment; and to this extent at least are, in the contemplation of courts of equity, substantially judicial persons. (Per Sir W. Grant, in Morris v. Bishop of Durham, 9 Ves. 404, 405; Hill on Trustees, 54; Lady Downing's case, Wilmot's Opinions, 1-35; Incorporated Society v. Richards, 1 Drury & Warren, 298; 2 Domat's Civ. Law, book 4, tit. 2, § 6.)

*Second Principle.*—In the creation and transfer of trust

property the appointment of trustee is matter of form; the trust is the substantial, and the legal estate the formal ownership. In the language of Chief Justice Wilmot, "the trust is the substance, and the legal estate the shadow; and as in the natural world the shadow follows the substance, so, in contemplation of equity, the legal title follows the trust wherever it goes." The result of this principle, which is equally applicable to charity as to ordinary trusts, is, that if there be no trustee originally appointed, or the person appointed be incapable or decline to accept, the courts supply the want of a trustee by directing those in whom the legal ownership rests to hold the property upon the declared trusts, or to transfer it to a trustee of their own appointment. (Sonly v. Clockmakers' Society, 1 Brown, C. C. 81; Adams' Eq. 36; per C. J. Wilmot, in Lady Downing's case, before cited; per Chan. Sugden, in Incorporated Society v. Richards, before cited; per Chan. Jones, in McCarty v. Orphan Asylum Society, 9 Cow. 484, 486.)

These principles being established, the only remaining question upon this part of the case under English equity law is, whether the purpose to which the property is here dedicated is such a purpose as that law allows to be a good charitable *cestui que trust;* and if it be, whether it is described with sufficient certainty in the instrument of gift.

(*a*) The purpose of the gift. In 1804 Sir William Grant said that it was not every charitable purpose, in the ordinary signification of the word, that was a charitable purpose in legal contemplation; that, in its largest meaning, charity denoted all the good affections that men ought to bear to each other; in its more restricted and common sense, relief of the poor; but that, in equity, those purposes only were considered charitable that were enumerated in the 43d of Elizabeth, or which by analogy were deemed to fall within its spirit. (Morris v. Bishop of London, 9 Ves. 405.) In 1824 the Master of the Rolls declared that it was the source from which the funds were derived, and not the mere purpose to which they were dedicated, which constituted them

charitable; and that funds derived from the gift of the crown, or the gift of the legislature, or from private gift, for any legal, public or general purpose, were within the equity of the staute. (Att'y Gen'l v. Heelis, 2 Sim. & Stu. 77; Att'y Gen'l v. Brown, 1 Swanst. 265; Nightingale v. Golburn, 5 Hare, 484.) As, however, the relief of the poor stands at the head of the list of legal charities enumerated in the statute, it is of course admitted that the purpose of the present gift—the perpetual relief of the poor of St. Louis— is a charitable purpose within the meaning of the law, and a competent legatee of the present bequest.

(b) The sufficiency of the description. This gift, however, is not for the relief of the poor of St. Louis generally, but for a particular class—the poor that come here from abroad to settle in the west; in the language of the testator, "poor emigrants and travelers coming to St. Louis on their way, bona fide, to settle in the west;" and this attempt of the donor to limit his bounty to the class of persons he wished to take care of, and his omission to provide a scheme for applying his bounty to their relief, produces the uncertainty upon which the whole argument against the validity of the gift rests. The objection that the beneficiaries of the gift are too vaguely described is not answered here by the proposition, that in charity gifts general charity without any specification whatever is sufficient, nor by an appeal to the English cy pres doctrine—which executes the supposed general charitable purpose of the grantor as near to his specific intention as possible; but the answer that is here relied upon is, that the objects of the charity are indicated with sufficient certainty to enable the court to see that the substantial intention of the giver is carried into effect. It may not, however, be improper here to refer to these doctrines of the English charity law, in order to distinguish them from the doctrine that is applicable to the present case. Charity it seems is a favored donee; and, accordingly, not only is a gift to general charity, without a trustee or any specification of objects, valid, (Clifford v. Frances, Freeman, 330; Frier v. Peacock,

36—VOL. XXIX.

Finch, 245, reported as Att'y Gen'l v. Mathews, 2 Lev. 167; per Lord Eldon, in Moggridge v. Thackwell, 7 Ves. jr., 75;) but in gifts to specific charities, if the particular purpose be unlawful, (Att'y Gen'l v. Baxter, 1 Vernon, 248; DeCosta v. Depaz, 1 Amb. 228,) or has ceased to exist, (Att'y Gen'l v. City of London, 3 Brown, C. C. 172,) or is not sufficient to exhaust the fund, (Att'y Gen'l v. Minshull, 4 Ves., jr., 14,) or has not been designated by the document, or party appointed for that purpose, (Moggridge v. Thackwell, 7 Ves., jr., 36; Att'y Gen'l v. Siderfin, 1 Vernon, 224; Mills v. Farmer, 1 Mer. 54;) or can not for any reason whatever be ascertained, or if ascertained can not be executed; in all these cases, the principal intention of the giver is presumed to have been to give *to charity*, and this supposed general charitable purposes is effectuated *cy pres*, as near the particular intention as possible. But if it appear that the individual charity was the only one in the donor's mind, and that has failed, the property results to the donor, (Adams' Eq. 71; Cherry v. Mott, 1 Myl. & Cr. 124; Att'y Gen'l v. Moultbee, 2 Ves., jr., 387; Mills v. Farmer, 19 Ves. 483;) and all this doctrine is derived from the Roman law. (2 Domat, 4 book, tit. 2, § 6; 1 Swimb. on Wills, 105, part 1, § 16; Digest 33, tit. 2; De usu et usufr. 16.) Under the English law, in the first class of cases, the king, as *parens patriæ*, is the trustee, and designates the particular charity to which the fund shall be applied; but in the other cases, the court of chancery dispenses the charity and executes the general charitable purpose as near the particular intention of the giver as possible. (Moggridge v. Thackwell, 7 Ves., jr., 75.) Under our system, the legislature is competent to designate the particular charity, where the gift is general; (Att'y Gen'l v. Jolly, 1 Richard. Eq. R. 108;) and there does not seem to be any objection in principle to the English *cy pres* doctrine—although it has been carried, no doubt, in the early English cases, to an unreasonable extent, much further than has been approved by modern English judges, and further, no doubt, than the American courts would go.

The present, however, is not a case for the application of these doctrines.  The gift is not to charity indefinitely, but for the relief of a specific class of persons; neither is the class to be relieved—" poor emigrants and travelers coming to St. Louis on their way *bona fide* to settle in the west"— so imperfectly described that the court is called upon to abandon the specific purpose of the giver, and to execute his supposed general charitable purpose in favor of some other object.  It would seem quite impossible to argue that the courts of justice can not ascertain what class of persons were intended by these words, and that this charity must fail upon this ground.  They are plain English-words, and describe a class of persons, who, at the very time that this will was made, were being relieved by voluntary associations of charitable persons in this city formed for that purpose; and certainly no plain man on the street would hesitate in answering the question, if it were put to him.  In Lady Hewley's charity, which has lately been the subject of so much discussion in the English courts, the class of persons and objects provided for were described as " *poor and godly preachers of Christ's Holy Gospel, poor and godly widows of the same class of persons, to provide for the preaching of Christ's Holy Gospel in poor districts and places, to assist in the education of young persons intended-for the ministry of Christ's Holy Gospel, and to assist poor and godly persons in distress*"—certainly quite as indefinite as the present description; and the question discussed was, not whether the charity was void on account of the difficulty of ascertaining the donor's intention, (that short mode of disposing of the matter did not occur to English common sense,) but what kind of evidence might be laid before the court to aid them in determining the classes of persons and objects that were intended by the donor.  (Shore v. Wilson, 9 Clark & Finnilly, 499–582.)  In charity trusts, the persons to be benefitted are always uncertain.  All the certainty required is a general description of the class of persons who are to receive the donor's bounty, not a particular designation of

the individuals; it is enough that there is such a general description of the objects of the charity as will bind the conscience of the trustee, and not leave him an uncontrolable power of disposition, which is ownership. (Shelford on Mortmain, ch. 5, § 4.) And certainly the objects of the present charity are quite as definite as they are in a great many cases to be found in the books, in which the trusts are adjudged good and enforced accordingly. (Bartlet v. Nye, 4 Metc. 387; Going v. Emery, 16 Pick. 107; Att'y Gen'l v. Jolly, 1 Rich. Eq. R. 105; Att'y Gen'l v. Wallace's Devisees, 7 B. Monr. 620; City of Richmond v. The State, 5 Porter, Ind. 636; Amer. Bible Society v. Wetmore, 17 Conn. 188; State v. Jerard, 2 Ired. Eq. 210; Magill v. Brown, Brightley, 359, note; Pickering v. Shortwell, 10 Barr, 23; Domestic & For. Miss. Society's Appeal, 30 Penn. 434; Att'y Gen'l v. Comber, 2 Sim. & Stu. 93; Baker v. Sutten, 1 Keen, 224; Ommanny v. Butcher, 1 Turner & Russell, 260; Milford v. Reynolds, 1 Philips, 185; Wicker v. Hume, 14 Beav. 522; Lyons v. East Ind. Com. 1 Moore's Priv. Coun. Cases, 175.)

Supposing, however, that the beneficiaries of this charity are sufficiently indicated in the gift, it is then objected to its validity that the manner in which the relief is to be administered to them is not provided, but is left altogether at large. The answer to this is, that when property is given in trust, the specific purpose to be accomplished is the substance of the gift; and the manner in which this purpose is to be effected is merely formal, and belongs to those who are entrusted with the execution of the trust—either the original trustees, or, in default of them, the courts of equity. Now in charity trusts, there are two sorts of authority—one as to the internal government of the charity, the other as to the management of the estates. In the former, the dispensers of the charity, those appointed by the founder for that purpose, are absolute and uncontrolable, except as they are limited by the expressed will of the founder; but, in reference to the estates, they are accountable to the court of chancery, upon the universal principle of English equity law, that all per-

sons who hold property in trust are accountable in equity for their management of it. (Att'y Gen'l v. Locke, 3 Atk. 165, per Lord Hardwicke; Green v. Rutherforth, 1 Ves., sr., 470; Lewin on Trusts, 392, chap. 20; Foster v. Foster, 2 P. Wil. 326; Att'y Gen'l v. Heelis, 1 Mylne & Cr. 627.) One may give his property to a specific charity without appointing any one to take the property and dispense his bounty; or he may give it to a trustee for the same purpose, without any further direction; or he may give it to a specific charity, accompanied by a scheme regulating the manner in which the charity shall be dispensed; and all these are valid dispositions of the property. In the first class of cases the charity is dispensed according to a scheme provided by the courts in the exercise of their power to execute trusts where there is no other trustee; in the second class, the trustee dispenses the charity according to his own scheme; and in the third class, it is dispensed by the trustee according to the scheme provided by the founder; and in the two last cases it is the duty of the courts to see—in the one, case that the scheme provided by the trustee applies the fund to the purpose of the trust and to no other—and in the other, that the fund is applied to the purposes of the gift, according to the scheme of the founder. The purpose of a scheme is not to designate the beneficiaries of the gift, but to provide the manner in which the fund shall be distributed to them. In gifts to a specific charity, the particular object to be accomplished is, as in ordinary special trusts, the substance of the gift; but the manner in which the purpose is to be effected is merely formal. This is sometimes provided by the founder of the charity, and must then be observed; at other times it is left to the trustee, and is then a proper subject for the exercise of his discretion; and at other times it is devolved upon the courts, either for want of a trustee originally, or because the trustee appointed can not, or will not, or ought not to execute the trust. Girard founded a charity for the education of poor orphan children, and appointed the City of Philadelphia to be his trustee, and provided a scheme for dispensing

it. Smithson, a British subject, founded a charity for the establishment at Washington of an institution for the increase and diffusion of knowledge among men, and appointed the United States to be his trustee, but left it to their discretion to adopt such a scheme for effecting the proposed object as they should from time to time judge best; and there are instances, in the books, of charities founded for a specific purpose, without either a trustee or a scheme. Judge Mullanphy has given one-third of his estate to this city in trust, to constitute a fund for the relief of poor emigrants and travelers coming here to settle in the west; but, instead of providing a plan for dispensing it for all time to come, he has, with less personal vanity and more practicable wisdom than was shown by Girard, left the details as to the application of his bounty to the discretion of the living community where it is to be dispensed, that they might from time to time be changed to meet the existing condition of things. In the President of the United States against Drummond, (referred to in Wicker v. Hume, 14 Beavan, 517,) the question before the British Rolls Court in May, 1838, was as to the disposition of the fund given by Smithson to the United States. The purpose of the gift was very general, and no plan for effecting it was provided by the donor; the fund was to go beyond the jurisdiction of the court; and finally the question was one of private property between British subjects and a foreign state, and involved a large sum. The gift was established, however; and the charity is now being dispensed by our national government according to a scheme provided by the United States, and stands quite as much a monument of the impartiality of British judicial justice as of private British munificence. But here it is argued that a charity almost as large and of more daily necessity and utility—given at large to this city for the relief of that class of poor persons that emigration will bring here for years to come—can not prevail for want of authority under our law to provide for its applications, either in the city, appointed by the donor for that purpose, or in the courts of the state. The want of a scheme

is an objection that was never suggested in an English court, and one that has rarely, if ever, been made in an American court, although, during the period that the doctrine of the Baptist Association case (to be hereafter referred to) prevailed—*that the persons to be benefitted by the gift must be specified with sufficient certainty to enable them to stand in a court of justice*, in gifts to unincorporated societies—the circumstance, that these bodies usually have a scheme by which they effect their charitable purposes, may have been referred to in order to obviate the objection of uncertainty in reference to the beneficiaries, which otherwise, according to the doctrine of the Baptist Association case, would have been fatal.

The construction that common sense would put upon this gift is that the city is to take the legal ownership, and to apply the revenue to be derived from the property to the relief of the persons indicated in the gift; and the question is whether the law will allow the gift so to take effect. The trust, we have seen, is valid although the city be incapable at law of holding the property; and it is now insisted that the city may, under the general law and independently of the act of March 12, 1859, dispense the revenue although they are incapable of owning the fund. The capacity of the city to execute the trust is one thing, and their capacity to take the property another; and these questions depend upon different considerations. Although, at one time, it was supposed that corporations were incapable of executing a trust, the general rule now is that they may execute any trust not foreign to their creation. (Ang. & Ames on Corp. 166, 167, 168; Att'y Gen'l v. Governors of Foundling Hospital, 2 Ves., jr., 46; Green v. Rutherforth, 1 Ves., sr., 468; Trustees of Philips' Academy, 12 Mass. 556; First Parish in Sutton v. Cole, 3 Pick. 237, 238; Chapin v. School District 35, N. H. 445.) And accordingly it was laid down by Justice Story, in the Girard charity case, 2 How. 189, 190, that municipal corporations may execute any trust germane to the purpose of their creation; and, as this city *may* provide for their poor,

they may of course dispense a perpetual charity founded for the relief of this class of persons. But if the city were incapable not only of the legal ownership, but also of executing the trust, it would then be the duty of the proper court of equity to give directions as to the application of the fund by a proper scheme for the purpose.

SECOND PROPOSITION.—The principles of the English charity law, which are relied upon in support of the present bequest, are in force in this state, either as part of the English unwritten law, or of the statute law of a general nature; and not local to that kingdom, passed before the 4th of James I.

*First.* They are not derived from the statute of Elizabeth, but are part of the common law. 1st. Such is the opinion of Chancellor Sugden, (Incorporated Society v. Richards, 1 Drury & Warren, 298, 320 ; Sausse & Scully, 607, decided in 1841,) and of Judge Story, (Girard charity case, 2 How. 194, 196, decided in 1844,) expressed judicially in cases where the question was directly up and elaborately argued; and certainly no opinions upon this question are of higher authority than the opinions of these two judges, expressed under such circumstances, and with all the information that recent and very thorough investigation had brought to bear on the subject. 2d. The very language of the statute is in conformity with this opinion. If the matter were altogether new, and a construction were now for the first time to be put upon the words of the law, they could not be construed as introducing a new rule upon the subject of charities, but only as providing a more efficient remedy for violations of the existing law. I refer the court to the remarks, upon this subject, of Chancellor Sugden, (Incorporated Society v. Richards, 1 Drury & War. 301, 306,) of Lord Redesdale, Att'y Gen'l v. Dublin, 1 Bligh, N. S. 37,) and of Chief Justice Denio ; (Williams v. Williams, 4 Seld. 542, 543 ;) although it is a little remarkable that Judge Tucker, in Galligo's Exec'rs v. Att'y Gen'l, 3 Leigh, 469, relies upon the same language in support of the contrary opinion. 3d. Although there is no direct adjudication upon this question—for the obvious reason

that it has never been a material question in the English courts—yet the weight of English judicial dicta is decidedly in favor of that opinion. We have the opinion of Sir Joseph Jeckyll, in Eyre v. Countess of Shaftsbury, 2 P. Wil. 119 ; of Lord Northington, in Tancred v. Att'y Gen'l, 1 Eden, 10, Ambler, 351 ; of Lord Elden, in Att'y Gen'l v. The Skinners Company, 2 Russ. 407 ; of Sir John Leach, in the Brentwood School case, 1 Myl. & K. 367 ; of Lord Redesdale, in Att'y Gen'l v. Corporation of Dublin, 1 Bligh, N. S. 347 ; of Chief Justice Wilmot, in Lady Downing's case, Wilmot's Opinions, 24 ; and of Lord St. Leonards, then Chancellor Sugden, in Incorporated Society v. Richards, before cited ; against the opinion of Lord Loughborough, in Att'y Gen'l v. Boyer, 3 Ves., jr., 714. 4th. Judge Baldwin enumerates forty-six different trusts (uses, as they were then called,) that had been declared by statute, or judicial decision, before the 43d of Elizabeth, to be valid charitable trusts, although that statute only enumerates twenty-one ; (Magill v. Brown, Brightly's R. 394, note, decided in 1833 ;) and the chancery cases recently brought to light by the researches of the English Record Commissioners (an abstract of fifty of which may be found in the report of the Girard charity case) show quite conclusively that these charitable trusts not only existed in fact before the statute of Elizabeth, but were also before that time protected and enforced in chancery like other trusts ; and Judge Story has remarked, (2 How. 195,) that in some of these cases there was no trustee, and that the trusts themselves were vague and indefinite. 5th. These facts only establish historically the state of English charity law to have been, before and at the passage of that statute, at that stage of its development that we might fairly have inferred that it would then have reached. A legal system in relation to charity trusts had before that time been developed in the law of christian Europe ; and, as the practice of giving property to public uses, both goodly and superstitious, (as they were distinguished in the old English statutes,) as well as to private uses, had prevailed very extensively in England long

before the reign of Elizabeth, and as these private uses had before then been protected and enforced in chancery upon principles drawn from the Roman law, it was to be expected that in a christian community, where charity was so highly extolled, charitable trusts would also be protected and enforced by the same court, (especially while clerical chancellors presided there,) upon principles applicable to public trusts, and drawn, too, from the same source. (2 Domat. 532, part 2, b. 4, tit. 2, § 6 ; 1 Swinb. 105, part 1, § 16.)

*Second.* If it be true, however, that these principles of the English law are not a part of the common law, but derive their vitality exclusively from the statute of Elizabeth, it is then insisted that this act, to this extent at least, is in force in this state by the terms of our statute introducing the English law. The American colonists brought with them the law of England, both written and unwritten, of a general nature, and not local to the mother country. (Blankard v. Galdy, 2 Salk. 411 ; 1 Kent's Com. 472 ; Commonwealth v. Knowlton, 2 Mass. 534, 335 ; Commonwealth v. Leach, 1 Mass. 60 ; Bogardus v. Trinity Church, 4 Paige, 198 ; Patterson v. Winn, 5 Peters, 241.) And Virginia acted on this principle in her ordinance of 1776, declaring what part of the English law was in force there ; and our territorial legislature, in substituting the English in lieu of the Spanish law, acted upon the same idea, and adopted the very language of the Virginia ordinance. (Terr. Act, 1816.) If, therefore, charity trusts like the present were not valid before the statute of Elizabeth, and that act is to be considered as the source from which they derive their validity, so far the statute must be considered as general, and made in aid of the common law, and of course in force in this state ; while the special remedy provided in it is local, and forms no part of the general law of England which the British colonists brought with them, and which we have expressly adopted by statute ; and this view of the statute of Elizabeth has been expressly adopted in several of the states. (Going v. Emery, 16 Pick. 115, 117 ; Whitman v. Lex, 17 Serg. & R. 88 ; McCord v.

Ochiltree, 8 Blackf. 15; Moore's Heirs v. Moore's Devisees, 4 Dana, 361 ; Carter v. Balfour's Adm'r, 19 Ala. 829.)

The result reached, I think, by the views here presented is, that the principles of English charity law, to which I have referred in support of the present gift, are part of the general law of England, and such, it is believed, is the present state of judicial opinion upon this question in almost every state of this Union.   The law applicable to charitable trusts had been very little considered in the United States before the Baptist Association case, 4 Wheat. 1, decided in 1819. The only previous case to be found is one in Massachusetts, Bartlett v. King, 12 Mass. 577, decided in 1815, where the validity of a charity trust came up in a real action, and the court contented themselves with holding the trust to be valid, without undertaking to determine how it was to be enforced in Massachusetts, where the courts had no chancery powers. The decision in the Baptist Association case was to the effect that the English law of charities—so far as it upheld donations to charitable purposes, *where there was no trustee to hold the legal title, and where also the cestuis que trust were not definite persons capable of standing in a court of justice and claiming their rights*—was derived exclusively from the statute of Elizabeth, and that this statute having been expressly repealed in Virginia, where the transaction arose, the gift, being of the character indicated, was void.   (Per Story in Girard charity case, 2 How. 192, 193.)   The doctrine of the case was, that the principle of the English charity law—*that a charitable purpose, without a trustee or a definite beneficiary, was a competent cestui que trust*—was derived from the statute and formed no part of the English equity law.   This opinion was reversed in 1844 by the opinion delivered in the same court, in the Girard charity case ; and the doctrine was there announced that the principle of the English charity law law here referred to was part of their equity system, and was not derived from the statute, as had been supposed in the former case.

During this interval, however, (from 1819 to 1844,) the

subject of charities underwent a good deal of judicial discussion in the United States, and the English doctrine was adopted and acted upon in Massachusetts, Vermont, Connecticut, New York, Pennsylvania, North Carolina, Kentucky and Ohio as part of their equity law, notwithstanding the decision in the Baptist Association case, although the case itself was rather evaded than directly overruled. (Going v. Emery, 16 Pick. 107; Burbank v. Whitney, 24 Pick. 148; Bartlett v. Nye, 4 Met. 378; Burr's Ex'rs v. Smith, 7 Verm. 250; Coggershall v. Pelton, 7 John. Ch. 292; Potter v. Chapin, 6 Paige, 649; McCartee v. Orphan Asylum Society, 9 Cowen, 444; Whitman v. Lex, 17 Serg. & R. 93; McGirr v. Aaron, 1 Penr. & Watts, 50; City of Philadelphia v. Elliott and others, 3 Rawl. 171; Martin v McCord, 5 Watts, 494; Griffin v. Graham, 1 Hawks, 96; State v. Jerard, 2 Ired. Eq. 210; White v. University, 4 Ired. Eq. 21; Moore's Heirs v. Moore's Devisees, 4 Dana, 354; Curling's Adm'r v. Curling's Heirs, 8 Dana, 38; McIntyre Free School v. Zanesville C. & M. Co. 9 Ohio, 286.) The Baptist Association case, however, exercised great influence during all this time upon judicial opinion throughout the United States, and was adopted and followed in Maryland and Virginia to its utmost limit. In the Maryland case, (Dashiell v. Att'y Gen'l, 5 Har. & John, 401,) bequests to competent trustees—one in trust " to feed the poor of a specific religious congregation in Baltimore," and the other " to feed the poor children of a certain county in the state, while attending a particular school in the county"—were declared void, on account of the indefiniteness of the beneficiaries; and in the Virginia case, (Galligo's Exec'rs v. Att'y Gen'l, 3 Leigh, 476,) a bequest to trustees to buy a lot in Richmond upon which to erect a church for the Roman Catholics of the city, was declared void for the same reason; and it was also followed in Tennessee, in Green and others v. Allen and others, 5 Humph. 170, which was determined by a divided court very shortly after the Baptist Association case had been overruled. The discussions in these cases, and in the cases that occurred during

the same period in the federal courts, (Beatty v. Kurtz, 2 Pet. 566; Ingles v. Sailors' Snug Harbor, 3 Pet. 99; Cincinnati v. White's Lessee, 6 Pet. 432, and Magill v. Brown, Brightley's R. 359, note,) together with the thorough investigation that the subject underwent in the Girard case, produced that change of opinion to which I have referred. And, since the Girard case, the doctrine that a charitable purpose is a competent *cestui que trust*, and that gifts to such purposes, without a trustee or definite persons to take as beneficiaries, has been adopted in South Carolina, Alabama, Indiana, Georgia, New Jersey, Rhode Island, Iowa and New Hampshire; (Attorney Gen'l v. Jolly, 1 Rich. Eq. 101; 2 Strob. Eq. 381; Carter & wife v. Balfour's Adm'rs, 19 Ala. 821; McCord v. Ochiltree, 8 Blackf. 15; City of Richmond, v. The State, 5 Ind. 336; Sweeny v. Sampson, 5 Ind. 446; Beal v. Fox's Exec'rs, 4 Georgia, 428; McBride v. Elmer's Exec'rs, 2 Halst. Ch. 107; Derby v. Derby, 4 R. I. 414; Johnson v. Mayne, 4 Iowa, 180; Chapman v. School District, 35 N. H. 445;) and has been still further illustrated and applied in Massachusetts, Pennsylvania, Kentucky and Ohio, in cases that have occurred in their courts since 1844. (Washburn v. Sewall, 9 Met. 282; Nelson v. Cushing et al., 2 Cush. 519; Methodist Church v. Remington, 1 Watts, 218; *ex parte* Cassell, 3 Watts, 440; Martin v. McCord, 5 Watts, 494; Weight v. Sim, 9 Barr. 437; Pickering v. Shotwell, 10 Barr. 23; Att'y General v. Wallace's Devisees, 7 B. Monr. 619; Zanesville C. & M. Co. v. City of Zanesville, 20 Ohio, 483.) Nor has the doctrine been since denied in any state except New York. There the conflict of decision upon this subject that had occurred in the courts of original jurisdiction subsequent to the cases in Johnson, Cowen and Paige, to which I have referred, (Kniskern et al. v. Lutheran Churches of St. John and St. Peter's et al., 1 Sand. Ch. 439; Shotwell, Exec'r, v. Mott et al., 2 id. 46; Ayres v. Methodist Church, 3 Sandf. S. C. 351, and Andrew v. N. Y. Bible and Prayer-Book Society, 4 id. 156,) was finally settled by the court of appeals in 1853, in favor of the doctrine in the

Girard case ; (Williams v. Williams, 4 Seld. 550 ;) but only to be unsettled again in 1856, in Owens v. Mis. Soc. of M. E. Church, 4 Kernan, 393. The decisions made in Maryland and Virginia (in both of which states the statute of Elizabeth had been expressly repealed) upon the authority of the Baptist Association case, still continue to be the law in these states ; but in Tennessee, two cases, (Dickson v. Montgomery, 1 Swan, 368 ; and Franklin and others v. Armfield and others, 2 Sneed, 357,) very recently decided there, can hardly be reconciled with the doctrine of Green and others v. Allen and others, in 5 Hum. 170, and seem to recognize as the law of that state the principles of the English charity law to the full extent that is necessary for the support of the present gift. In Connecticut and North Carolina, where the principles of the English charity law have always prevailed from the very origin of these communities, the adjudged cases are sufficient for the present bequest ; (Amer. Bible Society v. Wetmore, 17 Conn. 188 ; Griffin v. Graham, 1 Hawks, 96 ; State v. Girard, 2 Ired. Eq. 210 ;) yet other cases in these states stop short of what is believed to be the law of public charities. (White v. Fisk, 22 Conn. 52 ; White v. The University, 1 Ired. Eq. 21 ; Bridges v. Pleasant, 4 Ired. 27.)

Having now gone through with the principles and authorities applicable to charity gifts which are necessary to sustain the present bequest, I close the argument by recalling the attention of the court to two cases, (an American and a British case,) in which all these principles are recognized and applied, and which are so similar in their circumstances to the present case, that I might perhaps have safely relied upon them alone. In the British case—Incorporated Society v. Richards, before cited, 1 Drury & Warren, 298—the question was as to the validity, *under English equity law, independent of the statute of Elizabeth*, of a charity bequest to legatees incapable of taking by will and for beneficiaries that were altogether indefinite ; and the opinion in favor of it was by Sir Edward Sugden. In the American case, (Bartlett and others v. Nye and others, before cited, 4 Metc. 387, the ques-

tion was as to the validity, *under the law that the British colonists brought with them to this continent*, of a direct devise of real property to an unincorporated society, (the American Bible Society,) for the charitable purposes of the society, and the supreme court of Massachusetts established the gift. These two cases answer every objection that has been taken to the present bequest. There was no transfer of the legal ownership; the beneficiaries were altogether indefinite, and no scheme was provided for administering the charity, nor was any authority expressly conferred upon any person for this purpose; but such authority was implied from the gift, which, although ineffectual to pass the legal title, was deemed sufficient to constitute the legatees the dispensers of the charity.

The clear result of the whole matter, both upon principle and the authority of the adjudged cases, British and American, would seem to be that the bequest is a valid trust, although the city be incapable of taking the property and of dispensing the charity; and that, in that event, the proper court will dispense it, according to a judicial scheme, through new trustees of their own appointment; but if the city be competent to dispense the charity, as she is expressly declared to be by the act of March 12, 1859, (Sess. Acts, 1858–9, p. 280,) but incapable of the legal ownership, the court will appoint trustees to manage the property, and leave the city to distribute the revenue according to their own scheme; and that then the city may either take the direction of the proper court in advance, by submitting their scheme, or they may act in the first instance without such direction, subject, however, to judicial control as to the application of the funds to the objects of the charity.

In conclusion, I may be permitted to say that the question now to be settled is of great public interest, not only on account of the large amount of property involved, but also because the law of this state in reference to public charities is now for the first time to be announced and applied in this tribunal. Arguments drawn from the policy of encouraging

gifts of this character can have no weight here, and are expressly refrained from. This policy has prevailed in all civilized communities, and has covered the older states of this Union with charitable institutions for bettering the condition of men ; but this is not a matter for consideration in this court, whose duty it is, not to provide laws for the regulation of the affairs of men, but to apply the existing laws, as they find them, to the transactions of actual life.

Scott, Judge, delivered the opinion of the court.

Bryan Mullanphy died on the 15th of June, 1851, leaving a will, of which here follows a copy:

" I, Bryan Mullanphy, do make and declare the following to be my last will and testament: One equal undivided third of all my property, real, personal and mixed, I leave to the City of St. Louis, in the state of Missouri, in trust, to be and constitute a fund to furnish relief to all poor emigrants and travelers coming to St. Louis on their way, *bona fide*, to settle in the west. I do appoint Felix Costé and Peter G. Camden executors of this, my last will and testament, and of any other will or executory devise that I may leave. All and any such document will be found to be olograph, all in my own handwriting. In testimony whereof witness my hand and seal. Bryan Mullanphy, [seal]."

This will was attested lawfully, and was admitted to probate. It will be seen it was without date. The subscribing witnesses testified that they signed it as such in August, 1849. The estate was a large one, consisting of money and lands, a large portion of which was out of the limits of the city. The testator never married, and his sisters, five in number, were his heirs at law. This suit was commenced by petition in partition by the husband of one of the sisters, who were all married, against the remainder of them, and the City of St. Louis, claiming under the will, was made a party. There was a judgment for partition, and the portion of the real estate devised in trust to St. Louis was set

apart to her. Upon this judgment a writ of error was sued out from this court.

By an agreement between the parties, this cause is to be considered as though the points arising in it had been presented in a way in which the court could properly take cognizance of them; that this court shall not only examine the only point presented by the record, whether the city could take the land by devise in trust, but also the question whether the devise is such a one as under our laws is valid, it being for the benefit of *cestuis que trust* who are indefinite and uncertain.

The question whether the city can take the land in trust is a compound one, and involves, first, the inquiry whether, under her charter, she can take the land; and secondly, although she may have the capacity to take it purely as a gratuity or for her own use, yet whether she can take and hold it for the object mentioned in the testator's will, thereby making herself a trustee in respect to it. We will first consider the question whether the City of St. Louis, being a body corporate, can, under our laws, take lands by devise, leaving for future consideration the result that would follow from its being established that the city could not take the land.

By the first section of the act concerning corporations, (R. C. 1845,) the incidents of all corporations are enumerated, one of which is " to hold, purchase and convey such real and personal estate as the purposes of the corporation shall require, not exceeding the amount limited in its charter." The third section of the same act provides that " in addition to the powers enumerated in the first section of this article, and to those expressly given in its charter, or in the act under which it is or shall be incorporated, no corporation shall possess or exercise any corporate powers except such as shall be necessary to the exercise of the powers so enumerated and given." By the charter of St. Louis, passed 3d March, 1851, section two of the first article, it is enacted that the city " may purchase, receive and hold property, real and personal,

37—VOL. XXIX.

within said city, and may sell, lease, or dispose of the same, for the benefit of the city ; and may purchase, receive and hold property, real and personal, beyond the limits of the city, to be used for the burial of the dead of the city, also for the erection of water-works to supply the city with water, and also for the establishment of a hospital for the reception of persons infected with contagious and other diseases, also for a poor-house, work-house, or house of correction ; and may sell, lease or dispose of such property for the benefit of the city."

There is nothing in our statute concerning wills which prohibits corporations from taking by devise ; so that, as to their capacity to take by devise, they stand on the same ground as natural persons. The section of the statute concerning corporations above cited, in which are enumerated the incidents which result from the creation of a body politic or corporate, must be regarded as a substitute for the incidental powers which by the common law were annexed to every corporation. A corporation can do no act which is not expressly or impliedly authorized by its charter, or by the act under which it is created. The City of St. Louis is authorized to hold, purchase and convey such real and personal estate as the purposes of the corporation shall require, not exceeding the amount limited in her charter. This is by the general law concerning corporations. No amount being fixed by her charter, she can hold as much as shall be necessary for the purposes for which she was created a body corporate. Although it has been held, where a corporation is prohibited from taking by devise and is empowered to take by purchase, the word "purchase" shall be construed in its vulgar and not its legal sense, which signifies an acquisition by any other mode than by inheritance, yet that principle is not applicable under our law, which does not prohibit devises to corporations.

It is not denied but that the city, under her charter, could take all the lands devised to her within her limits, if the devise had been to her own use, uncoupled with the trust to

which, by the terms of the devise, it was subjected.   But it
is maintained that, as to the lands outside of her limits, she
could only take them for the specific purposes enumerated in
the section to which reference has been made ; and it is in-
sisted that the enumeration of the particular purposes for
which lands may be held beyond the limits of the city is an
exclusion of all other purposes for which lands thus situa-
ted may be held.   But the force of this argument is broken,
when we consider that, independently of the powers confer-
red by the charter, the city had, under the section of the act
concerning corporations above cited, a power to hold such
lands, without regard to their locality, as may be necessary for
the purposes of the corporation ; and the third section of the
same act declares that such power shall be in addition to any
power that may be conferred by the charter.   Statutes *in pari
materia* are to be construed so that they may all stand.   A
repeal of the statutes by implication is not favored in law.
Lands held by the city beyond her limits would be held by
her as by any individual proprietor, and her powers over
them would only be commensurate with those enjoyed by
private owners.   But, by authorizing her to hold lands be-
yond her limits for objects intimately connected with the
purposes of the corporation and highly necessary for her
prosperity and welfare, it was intended that, over such places,
she should exercise such police powers as would be required
in order to make them answer the purposes for which they
were designed.

We have no statutes of mortmain.   The apprehension of
any evils resulting from the ownership of lands by corpora-
tions has not been evinced by any general legislation.   The
law of this state regulating banks and banking institutions
has not only omitted the imposition of any restrictions on
the power of the banks to acquire real estate, but has ex-
empted them from the provisions of the first article of the act
concerning corporations, to which reference has already been
made, thereby leaving their powers in regard to this matter
as they stood at common law, which gave corporations an

unlimited power of taking and holding real estate. Indeed the great and still increasing assimilation of real to personal estate for all the purposes of commerce has, in a great measure, taken away the necessity for such restraints. Land at this day is not what it was in the days of feudalism. It is no longer clothed with the privileges, nor encumbered with the burdens, of that time; nor is it so far removed from the influence of commerce. It is, therefore, no matter of surprise that the statute concerning corporations, in enumerating the incidents necessarily annexed to them, placed real and personal estate in the same connection. These considerations, together with the fact that St. Louis is a municipal corporation, whose powers may be resumed at any time by the legislature, must produce the conviction that no policy is subserved in prohibiting her from taking real estate.

But although there may be no more policy, at this day, in the laws prohibiting corporations from purchasing real estate than in restraining them from diverting their capital to any other unauthorized purpose, yet, if the legislature has forbidden it, we are bound to enforce the prohibition. Availing themselves of this principle, the plaintiffs in error maintain that the city being authorized to purchase such lands as may be necessary for the purposes of the corporation, and the lands outside of her limits not being necessary for such purposes, she can not take them. Now, whatever may be the meaning of the word " necessary" — for it has different significations, meaning sometimes *indispensably requisite;* at others, *needful, requisite, incidental,* or *conducive to;* and it is admitted that there are cases in relation to land held by corporations in which that word has been made to bear the first of these significations—yet the meaning of that word is not involved in this proceeding. Whether these lands are necessary for the corporation is a question that can only arise in a proceeding instituted by the state against the city for abusing her right to purchase lands. The city had a power to purchase; if that power has been exceeded, then it has been violated, and the city charter may be forfeited in a

suitable proceeding; and until that is done, she will hold the land. The city may hold lands outside her limits for certain purposes. Shall she be compelled to contest, with every occupant who may get possession of them, her right to take and hold lands? There being a right in the city to purchase, if there is a capacity in the vendor to convey, so soon as a conveyance is made there is a complete sale; and if the corporation, in purchasing, violates or abuses the power to do so, that is no concern of the vendor or his heirs. It is a matter between the state and the city. The law is only directory in relation to corporations taking lands. It imposes no penalty, nor does it in terms avoid the conveyance. Nowhere is a corporation in express terms prohibited from taking and holding lands. The city is duly incorporated, with authority to hold, purchase and convey such real and personal estate as the purposes of the corporation shall require; and if, in holding and purchasing real estate, she passes the exact line of her power, it belongs to the government of the state to exact a forfeiture of her charter; and it is not for the courts, in a collateral way, to determine the question of misuser by declaring void conveyances made in good faith. In this view of the subject we are amply sustained by the authorities. (Baird v. Bank of Washington, 11 Serg. & R. 418; The Banks v. Poiteaux, 3 Ran. 136; Leasure v. Hillegas, 7 Serg. & R. 319; Angel on Corporations, § 152; Silver Lake Bank v. North, 4 John. Ch. 370.)

The next question in order is, whether the city, even admitting that she can hold the lands outside of her limits for her own use and in her own right, can become a trustee of them for the benefit of others. We are now speaking of the abstract right of corporations to hold property in trust, disconnected with any consideration of the lawfulness of the trust. Whatever may have been thought in ancient times in relation to this question—although a defect of the requisites to create a good trustee, the want of confidence in the person, may then have been deemed sufficient to prevent a corporation from becoming a trustee—yet that quaint reason is

no longer respected, and the doctrine is well established at this day that a corporation may be a trustee. Chancellor Kent says it was formerly understood that a corporation could not be seized of lands to the use of another, and that it was incapable of any use or trust, and consequently that it could not convey lands by bargain and sale. But the objection that a corporation could not convey by bargain and sale was utterly rejected in the common bench, in the case of Sir Thomas Holland v. Bonis, as a dangerous exception to the capacity to convey; and at this day the only reasonable limitation is that a corporation can not be seized in trust for purposes foreign to its institution. Equity will now compel corporations to execute any lawful trust that may be reposed in them; and in the case of the Trustees of Phillips' Academy v. King, 12 Mass. 546, it was held that a corporation was capable of taking and holding property as a trustee. Many corporations are made trustees for charitable purposes, and are compelled in equity to perform their trusts. Corporations appear to be deemed competent to perform the duties of trustees, and to be proper and safe depositories of trusts. (2 Kent, 280.) As corporations no more than natural persons are compelled to accept trusts, and as they can not become trustees against their will, if the trusts, with which they are clothed and whose performance they voluntarily undertake, are not inconsistent with nor foreign to the purposes for which they were instituted, there is no reason why they should be restrained from becoming trustees. Of their fitness and capacity to manage the trust, the author of it is the sole and rightful judge; and if he is satisfied, it is not for those who have no concern in the matter to object to the trustees he may see fit to appoint. A court of chancery is vested with the same jurisdiction over corporate trusts which it ordinarily possesses and exercises over other trust estates.

We propose now to consider the question, whether the trust created by the will is such a one as the city in her corporate capacity can accept, admitting that it is of such a

character that its performance could be enforced by competent trustees. As has been observed, there is no reason why a corporation should not have capacity to undertake the execution of a trust not repugnant to the purposes for which it was instituted, and such is now the established law. This question has been confused by mingling in the argument considerations of the illegality of the trust. The matter we are now examining is whether there is any thing in the nature of the trust with which the land devised by Mullanphy is impressed, which incapacitates the City of St. Louis, in her corporate capacity, from carrying it into effect, admitting that, if the trust had been confided to competent trustees, it would have been enforced by our courts. As it is established as law that a corporation has capacity to accept a trust not repugnant to the purposes for which it was created, we do not well see how any difficulty can arise in the determination of this question. Taking it for the present as admitted that this is a legal trust, what reason can be given why the City of St. Louis should not execute it? There is no force in the argument drawn from the liability of a trust to abuse and mismanagement under the control of a corporation. It is exposed to the like dangers in the care of individual trustees. The choice of trustees is a matter of judgment, and the devisor of the trust has, in the exercise of that judgment, preferred an artificial to a natural person. Both, as trustees, are equally liable to animadversion and control of the courts.

By the charter, the mayor and city council have the power to make such rules, regulations, by-laws and ordinances for the purpose of maintaining the peace, good government and order of the City of St. Louis, and the trade, commerce and manufactures thereof, as the city council may deem expedient. What repugnance is there in the exercise of powers like these, and the management in trust of a fund " to furnish relief to poor emigrants and travelers coming to St. Louis on their way, bona fide, to settle in the west ?" Commerce is intimately connected with emigration and draws it

within its influence. The means of transportation employed in commerce attract emigrants, and they avail themselves of those means for the purpose of emigration. The creation of a fund for the relief of poor emigrants at a great commercial point, would cause traveling to that point even by those who flattered themselves that they would never need relief. They, mindful of the vicissitudes of a long journey, and knowing that there was an asylum on the way in the event of a misfortune, would naturally prefer going among a people who had evinced so kind a regard for strangers. A charity of this character would be a benefit to the city, as it would increase the interest that would be felt for her prosperity and welfare. Many would reach the city in distress who had benefited her commerce before their arrival. Their means may have been all exhausted in paying for their transportation, which had been increased by events untoward and unforeseen.

Again, the city has power to make ordinances for her good government. To a large and commercial city emigrants will come as to a point from which, availing themselves of her facilities for transportation, they can diverge in the direction where they contemplate selecting their new homes. Good government on the part of the city would require that she should make some provision for those of that class who are in want and distress. As this is one of the consequences of her commerce, by which she is so much enriched, she must feel herself under obligation to mitigate some of the evils resulting from it. The city is also empowered to establish hospitals and make regulations for their government. A fund for the relief of poor emigrants found in the city may be made subservient to such of them as require the aid of a hospital. The fund, however it may be invested, would aid the hospital by relieving it from the necessity of retaining its inmates longer than without such fund charity would require them to be provided for. It is obvious that a trust, such as is contemplated by the will of Mullanphy, and a hospital, would reciprocally aid and assist each other.

When we regard St. Louis as a great commercial city, clothed with all the corporate powers deemed necessary for a wise administration of her municipal affairs, for her good government, and the promotion of her commerce, it is difficult to perceive how the execution of the trust of the will can conflict with the purposes for which she was incorporated. So far from it, the execution of such a trust is germane to the purposes of her charter, and will aid in the accomplishment of the great ends for which she received it. This view of the subject is not novel. It is amply sustained, as we think, by the case of Vidal and others v. Gerard's Exec'rs, 2 How. 127. It also harmonizes with the act of the 12th March, 1859, passed by the general assembly of this state. The act, in its preamble, recites : " Whereas doubts have been suggested as to the capacity of the City of St. Louis to take and hold property beyond the city limits, given for charitable purposes, and also as to the capacity of the city to execute charity trusts;" and it is therefore enacted " that the City of St. Louis is hereby declared to be capable of taking and holding property, real and personal, both within and without the city limits, given or to be given for charitable purposes, and of executing all such charity trusts in like manner as natural persons are." (Sess. Acts, 1859, p. 280.) Although it is not pretended that this act can operate to divest any rights vested before its passage, yet it may be regarded as a legislative declaration of opinion as to the law existing in this state in relation to the execution of trusts by corporations, and as such is entitled to the consideration of this court.

We now approach the question most argued at the bar, and which involves the extent of the jurisdiction of the courts of this state over charitable trusts. Charitable gifts and legacies have been presented to the courts distinguished by a great variety of attending circumstances. There have been charitable trusts in which the trustee was named and capable of taking the subject of the trusts, with the general purpose of the charity designated, while the objects to be ben-

efitted by it were uncertain and unknown. There have also been charitable donations, where the trustee could not take the property intended for such purpose, and where the beneficiaries of the charity were not described with certainty, leaving them to be ascertained by those who might be entrusted with its management. There have been many other charities distinguished by their peculiar circumstances, but the enumeration made will suffice, as we only propose to give an opinion as to the authority of our courts to execute the trust, the subject of this controversy, and which is embraced in one of the kinds that have been mentioned. There are courts in which it would be held that both classes just described would be enforced. But we do not deem it necessary to enter upon the consideration of that question, contenting ourselves with the determination of the only matter submitted to us. In the examination of this subject we disclaim all power to receive or reject the law of charities as we may deem most expedient for the interest of the state. For, while it may be admitted that charities are not only liable to great abuses in their creation, but also in their management, on the other hand it can not be denied that there are some which at once herald the names and fame of their founders far and wide, and dispense great blessings among those who are the objects of them. The weighing their advantages with their disadvantages is the province of the legislature; and until that branch of the government is induced to interfere, the courts must administer the law by the aid of those lights to which they resort in all other cases of doubt and uncertainty.

As there are some states in which the statute of 43 Elizabeth, respecting charitable uses, has been repealed, we do not consider that the opinions of the courts of those states, nor of other courts on the subject of the law of charities prevailing in them, should have any great influence in our judgment in relation to this matter. The case of the Trustees of the Philadelphia Baptist Association v. Smith & Robertson, 4 Whea. 1, decided in the Supreme Court of the Uni-

ted States, and Gallego's Exec'r v. Attorney Gen'l, 3 Leigh, 450, are cases which arose under the laws of Virginia; and in that state the statute 43 Elizabeth had been repealed. The case of Dashiell v. Attorney Gen'l, 5 Har. & John. 392, arose in Maryland, where the statute of Elizabeth was reported at an early day as not being in force, which report was acquiesced in as the law. If the statute of the 43 Elizabeth had been repealed in this state, we must confess we would have been embarrassed in endeavoring to uphold a charity which differed in any material respect from any other lawful trust. Although it might be argued that the repeal of the statute would not affect the common law, yet the two subjects were so closely joined, giving and receiving aid from each other, that such a measure could not fail to influence the judgment, and be regarded as evidence of the indifference if not the hostility with which the subject was viewed by the legislature. In declining to be governed by opinions formed from such considerations, we do not disparage the courts by which they were delivered, nor diminish in anywise the respect to which they are deservedly entitled.

The subject of charities is one of some importance; but as it is a matter entirely within the control of the legislature, we are relieved from the anxiety which might be felt were we conscious that our opinion was beyond the correction of the legislative power. If any evils should be apprehended from the existence of the law of charities as it is now understood, they can easily be corrected, or the cause of them be entirely removed, for the future. Our judgment can only affect the charities that have been already created, and their increase at any time may be prohibited.

Charities were not unknown to the ancient common law; and when it is observed that the common law has never prevailed where the christian religion did not exist, it is not remarkable that we should find that law a patron of charities. Hence from an early age in the history of our jurisprudence we see them, in some form or shape, so recognized in the courts that we can not be easily reconciled to the doctrine

that a trust for a charity is, like all other trusts, only to be enforced by the courts when all those circumstances concur which would authorize the execution of a trust between individuals, having no relation to any charitable use. This is doing nothing for charities, and leaves them standing as all other trusts. Swinburne says, "another privilege is, that the testament *ad pias causas* is not void for uncertainty (as other testaments are) ; and, therefore, if the testator say, I make the poor my executors, or, I will that my goods be distributed among the poor, such manner of appointing executors or legacies is not void."

In maintaining the proposition that the charity created by the will of Mullanphy can be enforced in our courts, we meet with no difficulty in finding cases in support of it. Our embarrassment grows out of the labor of arranging them. We are not of opinion that charities derived their existence from the statute of 43 Elizabeth. That statute was passed to provide remedies for abuses in the management of charities, and not for the purpose of giving validity to them by its own force. It referred to them as existing things, and gave an additional remedy to prevent them from being diverted from the objects for which they were created. The preamble to the act, after reciting a number of charities, declares that " they have not been employed according to the charitable intent of the givers and founders thereof, by reason of frauds, breaches of trust, and negligence in those that should pay, deliver and employ the same." Such language is not very consistent with the idea that charities had no existence previous to its passage. Frauds and breaches of trust are terms that could not be applied to things whose existence was not recognized by law. In the case of the Incorporated Society v. Richards, Drury & Warren, 301, Edw. Sugden, Lord Chancellor of Ireland, and afterwards Lord Chancellor of England, said that the statute did no doubt give an extended power of alienation by a forced construction ; but whilst it did so, one can scarcely avoid coming to the conclusion that its great object was to create a new jurisdiction, which, it was

hoped, would be more efficient in enforcing the due adminis-
tration of charitable uses. He continues: "There is not a
word in this act to render valid that which was invalid, or
that legal which theretofore had been illegal, but much to
enforce against those guilty of breaches of trust, that which
was treated as perfectly legal and binding at the time the act
of Parliament passed. If, then, 1 had to decide upon the
law of England at that time, I could not hold that gifts to
charities were illegal. It seems to me that this act of 43
Elizabeth proves that such gifts were binding, legal disposi-
tions at the time it was passed, although it was necessary to
employ more searching remedies and a new machinery to
protect and enforce them against breaches of trust, fraud and
negligence." In the case of the Attorney General v. The
Mayor of Dublin, 1 Bligh, N. S. 347, Lord Redesdale (Sir
John Mitford) said, "we are referred to the statute of Eliz-
abeth in respect to charitable uses as creating a new law
upon that subject. That statute only created a new juris-
diction; it created no new law; it created a new and ancil-
lary jurisdiction, a jurisdiction borrowed from the elements
which I have mentioned; a jurisdiction created by a commis-
sion to be issued out of a court of chancery to inquire
whether funds given for charitable purposes had or had not
been misapplied, and to see to their proper application."

In order to appreciate the force of these opinions, it must
be observed that they arose in Ireland, where the common
law prevailed, but where the statute of 43 Elizabeth was
never introduced. So they are entitled to great weight in
the consideration of the question before us, not only as being
the judgments of two of the most eminent of the English
judges, but from the great similarity of the circumstances
under which the question is presented here and in those
cases. In England this question can not directly arise since
the passage of the act of Elizabeth, though it has sometimes
been discussed when it was incidentally involved in determin-
ing whether a charity should be controlled by the inherent
powers of a court of chancery or under a sign manual of the

king. Our statute of the 19th of January, 1816, introduced " the common law of England, which is of a general nature, and all statutes made by the British Parliament in aid of, or to supply the defects of, the said common law, made prior to the 4th year of James the I, and of a general nature and not local to that kingdom." If the common law was aided by statutes not of a general nature but local to that kingdom, we see no reason why that law, as it existed there unaided by such statutes, should not be in force among us, as we have the means to execute it which were provided by the common law. The statute will certainly bear this construction. There is nothing in it which intimates that, where the common law was aided by a local statute that it should not be enforced here, although it can be done without the aid of the local statute.

Of late years the subject of charities has undergone a great deal of investigation, both in England and the United States; and the result of that investigation has strengthened the opinion that the law of charities did not derive its existence from the statute of 43 Elizabeth, and that there was an inherent jurisdiction in the court of chancery over the subject of charities before the enactment of that statute. The opinion of the Supreme Court of the United States, in the case of the Philadelphia Baptist Association, in which a contrary doctrine was intimated, has not given satisfaction; and in subsequent cases, occurring in the state courts, it has not been followed. Judge Story, speaking of that case in the subsequent one of Vidal and others v. Girard's Exec'rs, 2 How. 196, says: " Very strong additional light has been thrown upon this subject by the recent publications of the commissioners on the public records in England, which contain a curious and very interesting collection of the chancery records in the reign of Queen Elizabeth and in the earlier reigns. Among these are found many cases in which the court of chancery entertained jurisdiction over charities long before the statute of 43 Elizabeth; and some fifty of these cases, extracted from the printed calendars, have been laid before

us. They establish in the most satisfactory and conclusive manner that cases of charities, where there were trustees appointed for indefinite and general charities as well as for specific charities, were familiarly known to, acted upon, and enforced in the court of chancery." Whatever doubt, therefore, might be properly entertained on the subject when the case of the Trustees of the Philadelphia Baptist Association v. the Exec'rs of Hart, 4 Whea. 1, was before the court, (1819,) these doubts are entirely removed by the late and more satisfactory sources of information to which we have alluded.

In the case of Zimmerman v. Anders, 6 Watts & Serg. 219, in the supreme court of Pennsylvania, it was said: "Although the statute of 43 Elizabeth is not in force in this state, it would seem that it is so considered rather on account of the inapplicability of its regulations as to the modes of proceeding than in reference to its conservative provisions. These, I conceive, have been in force here by common usage and constitutional recognition; and not only these, but the more extensive range of charitable uses, which chancery supported before that statute and beyond it. Of such recognition of parts of a statute, though the statute itself be not in force, we are not without other examples." In the case of Burr's Exec'rs v. Smith and others, 7 Verm. 291, Chancellor Williams, in an opinion in which the law of charities is ably reviewed, observed that, from the examination he had been enabled to bestow on the subject, it appeared to him "that the law of charitable uses is not founded on any statute, but that it existed at common law, the elements of which were derived from the civil law, and the principles of it may be found both in the statutes and in the adjudicated cases long before the reign of Elizabeth." Chancellor Kent (2 Kent, 287) thus expresses himself in relation to this subject: "The elements of the doctrine of the English chancery in relation to charitable uses are to be found in the civil law, and it is questionable whether the English system of charities is to be referred exclusively to the statute of Elizabeth.

The statute has been resorted to as a guide, because it furnished the largest enumeration of just and meritorious charitable uses; and it may perhaps be rather considered as a declaratory law, or specification of previously recognized charities, than as creating, as some cases have intimated, the objects of chancery jurisdiction over charities. If the whole jurisdiction of equity over charitable uses and devises was grounded on the statute of Elizabeth, then we are driven to the conclusion that as the statute has never been reënacted, our courts of equity in this country are cut off from a large field of jurisdiction over some of the most interesting and meritorious trusts that can possibly be created and confided to the integrity of men. It would appear from the preamble to the statute of Elizabeth that it did not intend to give any new validity to charitable donations, but rather to provide a new and more effectual remedy for the breaches of those trusts."

The foregoing citation of authorities, as to the views of the English and American judges in regard to the state of the law of charities before the statute of 43 Elizabeth, must suffice. The list might be greatly increased. In most of the states of the Union where the subject of charities has been discussed, they have been sustained, with some modifications of the law as it was administered in England, and that, too, since the case of the Philadelphia Baptist Association, in which it was thought that, independently of the statute of Elizabeth, trusts for charities were subject to the rules which govern all other trusts.

It is objected to this charity that it is contrary to sound policy; that it would be the means of attracting from abroad those who had no purpose of emigrating, merely for the sake of obtaining the relief to be furnished by the fund; and thus would fill the city with paupers and vagabonds. It will not be denied that the will creates a charity. It would be an act of charity this day to furnish relief to poor emigrants and travelers in St. Louis on their way, *bona fide*, to settle in the west. If the charity is carried out according to the

will of its founder, no injury to the community in this respect can result from its establishment. The objection seems to have its support in the idea that there will be a want of capacity in the trustees to ascertain who will be entitled to the benefit of the charity. If the first proclamation of the fact that there is a fund to furnish relief to all poor emigrants and travelers coming to St. Louis, *bona fide*, to settle in the west should induce those not intended to be beneficiaries of the trust to apply for relief, their refusal would prevent such applications for the future; and, moreover, the class of persons intended to be benefited might be made known with such publicity that all motives to the unworthy to come to St. Louis merely for the sake of charity, without any ulterior design of settling in the west, would be removed. We can not be persuaded that it is a valid objection to a charity, that from a possible abuse in its administration an injury might result to the interests of the society in which it is located. Such an objection would prove fatal to the existence of most charities. Moreover, the trustees in the management of the trust would be subject to the control of the courts, and for a wilful violation of their duty they might, like all other trustees, be displaced.

The only remaining question to be considered is whether the trust of this will can be enforced on account of the uncertainty of those who are to be benefited by it. The case, as we view it, shows that there is a valid devise to a trustee capable of taking the subject of the devise and competent to undertake and execute the trust with which the devise is clothed. As the general object of the charity was specific and certain, and not contrary to any positive rule of law, with a competent trustee to execute the charity designated, we do not see on what ground this objection can rest. If, under such circumstances, the uncertainty of the persons to be relieved by a charitable fund could be available to destroy it, few charities could be sustained. If all the recipients of a charity could be designated with certainty at the time of its creation, there would be no necessity for a law for chari-

38—VOL. XXIX.

table uses different from that which governs all other trusts. The only difficulty in the way would be the law against perpetuities, and that would not exist where the donation in trust was made to a corporation. From the very nature of the subject, charitable gifts must be objects vague and uncertain. The subjects of the charity may be numerous, and they are to be sought for and ascertained by those to whose discretion and judgment the dispensation of the relief is entrusted. The founder of a charity, by placing his fund in the hand of a competent trustee, designating the general object of the trust, with power to carry that object into effect, makes the trustee his substitute or delegate. Can not any individual, who has the means, employ them for the relief of "poor emigrants and travelers coming to St. Louis on their way to settle in the west?" If he can carry out this charity himself, may he not appoint another to do it for him? Could it be objected to such a course that the trustee would not know how to act? As the donor of the bounty is willing to confide its management to the discretion of his agent, so long as that agent acts in good faith his acts are the acts of his principal, and there is no one but the principal to complain. If the agent abuses his trust, he, like all other fiduciary agents, is subject to the control of the courts.

But the answer to the objection of uncertainty is, that by the law, as it stood unaffected by the statute, courts of equity, by virtue of their inherent powers, would execute such trusts and carry them into effect. In the case of Mogridge v. Thackwell, 7 Ves. 86, it was held by Lord Eldon that where there is a general indefinite purpose, not fixing itself upon any object, the disposition is in the king by sign manual; but where the execution is to be by a trustee, with general or some objects pointed out, there the court will take the administration of the trust. This language Story adopts in relation to this subject both in his Equity Jurisprudence, (§ 1190,) and in his Appendix on Trusts to 4 Wheat. 20. It is somewhat vague; and unless the facts of the case in which it was employed are known it may mislead. Certainly that

case carried the doctrine of charities to a great extent; and well may the chancellor have doubted and showed reluctance in acquiescing in it. These are the material facts: A testatrix gave "all the rest and residue of her personal estate unto James Vaston, his executors and administrators, desiring him to dispose of the same in such charities as he shall think fit, recommending poor clergymen who have large families and good characters." The residue of the personal estate amounted to £50,000. Vaston died before the testatrix, and the question was whether the disposition of the residue devolved on the crown as the general guardian of all charities; or whether, in the event that had happened, there was a lapse for the next of kin. The case was decided on a rehearing of the original decree of Lord Thurlow, who held that the residue of the personal estate passed by the will and ought to be applied in charity, regard being had to poor clergymen with large families and good characters, according to the recommendation of the will. The trust was executed by the court through a scheme approved by the Master, who had authority to receive proposals from the parties for that purpose. The decree of Lord Thurlow was confirmed by Lord Eldon. The facts of this case explain the language used by the chancellor and show how far the doctrine of the powers of the court as a court of chancery was carried. It shows what is meant by the phrase "with general or some objects pointed out." The objects pointed out were the poor clergy, but the will did not contemplate that the poor clergy should have all the residue, and as the legatee of the charity had died before the testatrix there was no person to designate the charities to which the residue should be applied. It was not supposed that if Vaston had lived the execution of the trust would not have devolved on him. His death produced all the difficulty in the case. We have been thus particular in stating the facts because they serve to explain the obscure language used by the books in speaking of the inherent jurisdiction of courts of chancery on the subject of charities, and also show that the charity with

which we are dealing, in its circumstances, falls within the class of those where there is a trustee appointed and "the general object of the charity was specific and certain," according to some, (2 Kent, 287,) or where "a charity is definite in its objects and is to be executed and regulated by trustees," according to others. (Story, § 1191.) Of this latter class, Story says: "Whether the trustees are private individuals or a corporation, the administration properly belongs to such trustees ; and the king, as *parens patriæ*, has no general authority to regulate or control the administration of the funds. In all such cases, however, if there be any misuse or abuse of the funds by the trustees, the court of chancery will interpose at the instance of the attorney general, or the parties in interest, to correct such misuse or abuse of the funds. But, in such cases, the interposition of the court is properly referable to its general jurisdiction as a court of equity to prevent abuse of a trust, and not to any original right to direct the management of a charity, or the conduct of the trustees. Indeed, if the trustees of a charity should grossly abuse their trust, a court of equity may go the length of taking it away from them, and commit the administration of the charity to other hands. But this is more than the court will do, in proper cases, for any gross abuse of other trusts."

In coming to the conclusion that this charity should be carried into execution by our courts, we are sustained by the case of Vidal et al. v. Girard's Exec'rs; 2 How. ——; and we can not but incline to the opinion that, as this case is viewed by us, there is a great similarity between them.

It can not have escaped the attention of one who has looked into the cases involving the law of charities as it has been administered both here and in England, that a great diversity of opinion exists in relation to it. Whilst most of the American courts maintain that charities existed at common law independently of the statute of Elizabeth, they have expressed their unwillingness to carry it to the length to which the court of chancery in England has done in order

to uphold charitable donations. This is the first case that has occurred in our courts, and we shall not attempt to define the extent of their jurisdiction in this branch of the law, or to point out the particulars in which it varies from the law as it is administered in England. This can not be done at once. But the subject must be left to be gradually developed as cases may arise.

After a long and laborious examination of this case, we feel ourselves constrained to carry into effect the will of the founder of this charity. To turn from the beaten track on this subject and follow cases decided under influences which do not exist here, would be to depart from the course pursued in the administration of the law in other cases. Because the subject is new to us, and never before has undergone an examination in our courts, we are not the less bound to ascertain and declare the law as we find it, discarding all pretensions to a discretionary power to admit or reject the law of charities by reason of any diversity of opinion that may be entertained in regard to the existence of such a law, or any portions of it.

Judgment affirmed; the other judges concur.