ANDERSON et al. v. ROBERTS et al., Appellants.

In Banc, December 24, 1898.

1. **Trusts and Trustees: CARE.** Trustees to whom is bequeathed a fund to be used for certain benevolent purposes, are required to act with that prudence in managing, investing and preserving it, that they would use for themselves in handling their own property "according to the usages of business."

2. ————: COUNTY JUDGES: ROLLINS AID FUND. The trust fund in this case, by the will of the testator, and its acceptance, was committed to the judges of the county court, not as individuals, but as judges of the court.

3. ————: ————: AGENT: COUNTY TREASURER. Judges of a county court, made trustees, as judges, of a fund bequeathed for the education of poor young men and women in the county, have the right to employ an agent to handle it, and if the experience, talents, reputation and financial standing of the county treasurer suggest that he is a proper person to receive the custody and management of it, they may make him their agent, and having done so, they are not responsible for the loss or misappropriation of the fund by him, any more than they would be for ordinary county

funds. The remedy of a subsequent set of judges for the recovery of the fund, would be a suit on the treasurer's bond, which, under the statute, is broad enough to embrace trust funds so committed to him.

BURGESS, J., concurs in reversing the judgment against the judges on the ground that the county court is the real trustee, and the judges as a court could only be held liable for malfeasance in office.

*Held*, by GANTT, C. J., *dissenting*, that the trust in this case was not to be executed by the county judges in their official character, but by them as individuals, and "their successors in office" in their private and individual character; that the treasurer had no official right to handle the fund, and the judges none to commit it to his care, and hence his bondsmen are not liable for that part of it converted to his use; that the judges were guilty of negligence in permitting him, as their agent, to use and retain the fund in his broken financial condition, and in failing to exercise proper control and care over it in his custody, and are therefore liable for that part of it by him lost.

*Appeal from Boone Circuit Court.*—HON. JOHN A. HOCKADAY, Judge.

REVERSED.

C. B. SEBASTIAN and W.M. WILLIAMS for appellants.

(1) The circuit court erred in charging the defendants personally with the shortage of treasurer Gillespy in his accounts with this fund. The judges of the county court had the right to employ an agent to hold the actual custody of the securities and money and to keep the accounts. Trustees may employ agents, when to do so is in accordance with the usual and ordinary course of business. 2 Story's Eq. Jur., sec. 1269; Carpenter v. Carpenter, 34 Am. Rep. 716; 1 Beach, Modern Eq. Jur., sec. 252; Purdy v. Lynch, 40 N. E. Rep. 232. (2) The defendants, having the right to appoint an agent as the actual custodian of the fund, under their supervision and direction, and having exercised due care in the choice of a party to fill that position, can not

Anderson v. Roberts.

be made liable for a misappropriation of a part of said funds by him without their knowledge and without any fault or negligence upon their part. Speight. v. Gaunt, 9 App. Cas. 1; State ex rel. v Meagher, 44 Mo. 356; Atterberry v. McDuffee, 31 Mo. App. 603; 1 Beach on Modern Eq. Jur., sec. 252; Purdy v. Lynch, 40 N. E. Rep. 232; Carpenter v. Carpenter, 34 Am. Rep. 716; 2 Story's Eq. Jur., p. 703, sec. 1269.

TURNER & HINTON and WELLINGTON GORDON for respondents.

(1) The trustees were guilty of a breach of trust in confiding the custody and keeping of this fund to the hands of an agent, and are liable for the amount of the agent's shortage. Turner v. Corney, 5 Beav. 517; Ghost v. Waller, 9 Beav. 497; Trutch v. Lamprell, 20 Beav. 116; Griffiths v. Porter, 25 Beav. 236; Corwell v. Gatacombe, 27 Beav. 568; Rowland v. Witherden, 3 Mac. & G. 568; Clough v. Bond, 3 Myl. & Cr. 490; Walker v. Simmonds, 3 Swanst. 1; Bostock v. Floyer, L. R. 1 Eq. 26; Lewis v Nobbs, L. R. 8, Ch. D. 591; Fry v. Tapson, L. R. 28 Ch. D. 268. (2) The trustees in their selection of an agent, and in their supervision over him, failed to exercise proper care, and are liable for the loss arising therefrom. Robinson v. Harkin [1896], 2 Ch. D. 415; Rowland v. Witherden, 3 Mac. & G. 568; Mendes v. Guendella, 2 J. & H. 259; Hanbury v. Kirkland, 3 Sim. 265; Thompson v. Finch, 22 Beav. 327; Bates v. Underhill, 2 Redf. 365; Richards v. Seal, 2 Del. Ch. 266; Fesmire's Appeal, 19 Atl. Rep. 502; State v. Guilford, 15 Ohio, 594; McCloskey v. Gleason, 56 Vt. 264.

TURNER & HINTON and WELLINGTON GORDON for respondents on motion for rehearing.

The respondents pray the court to set aside the judgment of reversal in this cause, and grant them a rehearing

for the reasons following: *First.* Because the majority opinion is based upon evidence not preserved by the bill of exceptions. All of the evidence touching the prior administration of this trust, was introduced at the first hearing at the June term, 1895, on the issue as to the acceptance of the trust. At that time a decree was entered finding an acceptance of the trust in 1887, and directing that an account be taken of its administration. No bill of exceptions was filed at this term, and no leave obtained for a subsequent filing. After the lapse of several terms, the decree was entered charging the defendants with the amount of Gillespy's shortage, and then for the first time a bill of exceptions, attempting to embrace the evidence adduced at the hearing several terms before was filed. Under the statute, this bill could not preserve for review anything occurring prior to the time at which the last decree was entered. R. S. 1889, secs. 2167 and 2168; Barber Asphalt Co. v. Ullman, 137 Mo. 564; Ins. Co. v. Rosenheim, 56 Mo. App. 27. *Second.* Because the majority opinion, in so far as the same holds that the will creating the trust constituted the county court the trustee, overlooks the ruling of this court in Harwood v. Tracy, 118 Mo. 631, wherein it is expressly held that a county court is a special statutory tribunal, having no powers whatever beyond those expressly conferred by statute. *Third.* Because the majority opinion, is so far as it justifies the conduct of the appellants in intrusting this fund to the treasurer, on the ground that it was covered and protected by his official bond, raised a question not heretofore presented by brief or oral argument, and on which counsel for respondents have had no opportunity to be heard. Because it overlooks the fact, that under the ruling of this court in Harwood v. Tracy, 118 Mo. 631, the county court, as such, had no power or jurisdiction to place any funds in the hands of the county treasurer except those of which he is made custodian by the statute. And if the opinion means to hold that the appel-

lants, in their capacity as trustees under the will, could render the county treasurer's bondsmen responsible by turning over to him a fund which it was not his duty under the statutes to keep, then it overlooks the ruling in State ex rel. v. Davis, 88 Mo. 585, wherein it was held, that an officer's bondsmen were only liable for the performance by him of such duties as the law imposes, and not for such duties as individuals might see fit to confer upon him. *Fourth.* Because if the appellants, in their capacity as county judges, had power or jurisdiction to order this fund into the hands of the county treasurer, so that he became liable to account for it as in case of county funds, then the appellants admittedly failed to semiannually ascertain by actual examination and count the funds in the hands of the treasurer, and to what funds they belonged, as required by statute. R. S. 1889, sec. 3175. And for a failure to perform their statutory duty with reference to public funds under their charge, county judges are personally liable. Knox County v. Hunolt, 110 Mo. 67. *Fifth.* Because, if the county treasurer was liable on his official bond for the misapplication of this fund, then it was the duty of the trustees, when they discovered the shortage in January, 1891, to require the bondsmen to make it good, within the period of limitations under section 6776, Revised Statutes 1889; and no excuse is shown for their failure during the succeeding four years of their incumbency in office as trustees to require a settlement of this shortage, the amount of which they admittedly did not take the trouble to ascertain.

MARSHALL, J.—In 1845, Anthony W. Rollins died, testate, devising to the then judges of the county court of Boone county the sum of ten thousand dollars, in trust, to loan the same upon good security, collect the interest, apply three-fourths of the interest to the education of such poor

youths, male or female, of Boone county as desired to avail themselves of such aid and who should be selected by the president of the State university and the principal of the Columbia Female Academy; the remaining one-fourth of the interest and any unexpended balance of the three-fourths to be added to the principal.

The fund remained in the hands of James S. Rollins. from 1856 to September 8, 1867, when on motion of Rollins the county court ordered that the county treasurer receive of said Rollins, Union military bonds, at their par value, for the debt due by James S. Rollins to the county court, on account of the Rollins bequest, and pursuant to this order Rollins turned over the bonds to Moss Pruitt, the then county treasurer, who held the fund during his term, and turned over the same to his successor, R. B. Price, in January, 1868. Price held the fund during his term, and at the end thereof, in December, 1876, he turned it over to his successor, J. M. Samuels. He likewise held the fund until the end of his term in December, 1882, when he turned it over to his successor, G. W. Trimble (one of the plaintiffs herein). Pursuing the course of business of his predecessors Trimble held the fund until the end of his term in January, 1887, when he turned it over to his successor, J. C. Gillespy. The fund at this time amounted to $37,844.70, of which $880.15 was in cash, and the balance in bonds and secured notes. Gillespy was re-elected county treasurer in 1891, and held office until January, 1895. Upon his final settlement Gillespy was found to be $4,758.44, short in respect to the fund, and also short in his accounts as county treasurer.

The various county treasurers kept separate statements as to this fund, but adopted different methods of keeping the securities and cash and paying out the money. The plaintiff Trimble while county treasurer kept the money of this fund mixed with the money of the county and made payments by checks signed by him as treasurer of Boone county

and sometimes in cash. Prior to his election as county treasurer Gillespy had been twice elected sheriff and once collector of Boone county, his reputation for honesty was beyond question and he was generally regarded as a responsible man financially. At the end of the first term his bondsmen, who were directors and stockholders of the bank in which he kept his deposits, refused to go on his bond for his second term, but he gave a good bond signed by some of the best people in Boone county. The defendants, then judges of the county court, are not shown to have had any notice of this refusal of his former bondsmen.

The practice of the judges of the county court had always been to have reports from time to time of the condition of the fund. Substantially the whole fund was invested in notes secured by mortgages on real estate or in good bonds. No considerable sum was, at any time, kept in cash. The treasurer collected the interest and principal of the loans, as they fell due, secured new borrowers, and the judges examined and approved the securities offered.

The plaintiffs are the successors, as.county judges, of the defendants, and upon their induction into office refused to accept any of the trust funds from defendants (who were such judges during Gillespy's two terms as treasurer) until a judicial determination was had as the proper amount. To determine this question, this action was begun. The petition alleges, as a specific breach of trust by defendants, that they loaned four thousand dollars and upwards of the trust funds, to Gillespy without any security, when he was insolvent, whereby that sum became lost to the trust fund, and then prays for a discovery and accounting. The result in the circuit court was that defendants were charged with Gillespy's shortage of $4,758.44, allowed $2,000 as compensation for their services and those of Gillespy, interest was added to the difference, and.judgment entered for $3,639.68. Defendants appealed.

I.   The plaintiffs assert two propositions: 1st, that in intrusting the funds and securities to the custody and keeping of an agent at all, the defendants were guilty of a breach of trust; and, 2d, that even if defendants had a right, under the circumstances, to employ an agent they were guilty of a breach of trust in permitting the agent to have the custody of the fund and in failure to exercise due care in the selection of Gillespy as their agent and in their supervision over his conduct.

The converse is the contention of defendants.

It is a general rule that trustees must retain the custody of trust funds, and execute the trust themselves and not through the instrumentality of an agent, or as it is sometimes said they can not delegate their powers. [Turner v. Corney, 5 Beav. 515; Bostock v. Floyer, L. R. 1 Eq. 26; Ghost v. Waller, 9 Beav. 497; Clough v. Bond, 3 Mylne & Craig, 490; Deaderick v. Cantrell, 10 Yerg. 263.] But there are exceptions to the rule, arising from necessity, or from the common custom of mankind, in which the trustee is entitled to employ an agent and will not be liable for losses occurring from the act of the agent, if the selection was a proper one.   [2 Story Eq. Jur. (13 Ed.), sec. 1269, and cases cited in note; 1 Beach, Modern Equity Jur., sec. 252, and cases cited; Hill on Trustees, marg. p. 573.] PERRY on Trusts (4 Ed.), sec. 404, states the rule to be:   "But there are circumstances where the trustees must employ agents. Lord HARDWICKE said: 'There are two sorts of necessity, *legal* necessity and *moral* necessity.   As to the first a distinction prevails.   Where two *executors* join in giving a discharge for money, and only one of them receives it, they are both answerable for it; because there is no necessity for both to join in the discharge, the receipt of either being sufficient; but if *trustees* join in giving a discharge and one receives, the other is not answerable, because his joining in the discharge was necessary.   *Moral* necessity is from the usage

of mankind, if the trustee acts prudently for the trust, as he would have done for himself, 'and according to the usage of business;' as if a trustee appoint rents to be paid to a banker at that time in credit, but who afterwards breaks, the trustee is not answerable. So in the employment of stewards and agents; for none of these cases are on account of necessity, but because the persons acted in the usual method of business.'" Many illustrations could be added, e. g. where the trust consists of a large number of houses, where the rents are small and payable monthly; the trustee could attend to the business himself; but it is not usual for owners to do so themselves and trustees are not expected to. Or if the trust consists of a cattle ranch, the trustees could feed and herd the cattle themselves, but it would be unreasonable to expect it. Or where the trust consists of notes due from persons living in different states; the trustees could go to each State and collect them, but it is not according to the usual course of business.

These illustrations demonstrate that the general rule is subject to more exceptions than those arising purely from necessity. They apply to the case at bar in principle, though not in similitude. In State ex rel. Townshend, Adm'r, v. Meagher, 44 Mo. loc. cit. 363, CURRIER, J., speaking of the care which trustees must exercise over trust property said: "The care must be graduated according to the character of the property, its value, and the convenience of its being made secure, the facility for its being stolen, and the temptations thereto." Other cases hold to the doctrine that a trustee can only employ an agent in cases of *actual* necessity, but the rule laid down by Lord HARDWICKE is based upon better reason and the common custom of mankind.

In this case the defendants might have kept the securities and cash in a strong box in a bank or safe deposit, with triplicate keys, one held by each, and all necessary to open the box. But this is not the common custom of mankind.

They might have made all the loans and collections themselves, going in solemn form, in single file or in solid phalanx after the delinquent debtors, and returning, laden with spoils, have proceeded in a body to lay the treasures away in the triply guarded depository, but this is not the custom of trustees.   In short they might have constituted themselves a constant guard of honor  over the fund, like the dragon guarding the Golden Fleece at Colchis, to prevent some Jason from running away with it, but their eccentricity in so doing would have excited wonderment in our practical day and generation.   But they were not obliged to do any of these ostentatious acts.   They were *judges,* not mere private trustees selected on account of special confidence of the creator of the trust.   Judges of only a county court it is true, but nevertheless judges, elected by the people to attend to the business of the people of the county.   They were trustees because they were judges not judges because they were trustees and not because they were selected with special confidence in their fitness to administer this trust. They had a right to employ an agent, and what agent could be found more suitable than the person who had been twice elected sheriff, once collector and twice treasurer of the county?   He, too, a man of unquestionable integrity and, so far as defendant's are shown to have known, of personal financial responsibility.   When the funds were turned over to him by Mr. Trimble there was only $880.15, in cash, the balance of the $37,844.70, being in notes and bonds.   There was then, apparently, small "facility for its being stolen," and the cash item afforded little "temptation thereto," especially to one who had been so honored by his fellow citizens and who had built up a good name in the community. But he turned out $4,758.44 short, and for this reason it is argued the defendants had no right to employ an agent or if they had they were guilty of want of care, for which they are liable, in employing Gillespy.

If the disastrous *results* are to be accepted as the true measure of care required of mankind, and to have relation to the inception of the employment, then it would only be necessary to prove a loss, and want of care would follow as conclusively as a mathematical deduction. This is not even the rule of the harshest cases to which our attention has been directed.

The true facts in regard to this matter put a different phase on the liability of the defendants from that attaching to mere private trustees.

The will of Mr. Rollins bequeathed ten thousand dollars "for the education of such poor and indigent youths of Boone county, both male and female, as are unable to educate themselves." The executors were directed to pay over that sum to the then justices of the county court of Boone county or their successors in office, and the will provided that "said fund shall remain with, and be vested in, said *court* as a permanent fund for the promotion of the object specified in the 7th item of this will above." It further directed the *judges* of the county court to loan "the funds thus vested in *them,*" and concluded by directing the "*county court* of Boone county" to make an annual report to the board of curators of the State University as to the amount and condition of the fund. Mr. Rollins died in 1845. On September 15, 1856, Mr. James S. Rollins appeared before the county court, gave a bond for $10,600, with security, which, when paid, was to be taken in full discharge of the Rollins bequest. On December 1, 1862, Mr. Rollins was allowed to retain the fund for twelve months without interest. On September 8, 1867, Mr. James S. Rollins appeared before the county court and on his motion it was ordered by the court that the treasurer of Boone county be authorized to receive of said Rollins, Union military bonds at their par value for the whole or any part of the debt due by him to the *county court* of Boone county,

on account of the Rollins bequest. Accordingly the fund was turned over to Moss Pruitt, the then treasurer of that county, Pruitt turned over the fund to his successor Price, who in turn, turned it over to his successor Samuels, and he to Trimble, and Trimble to Gillespy. During all these years from 1867 to 1895 the county treasurers held possession of the fund, mixed it with and treated it like county funds, paid it out on checks signed by them as such treasurers, and made reports to the county court, which made orders of record in the county court records in reference thereto.

It is plain therefore that Mr. James S. Rolllins, every county treasurer and every county judge of the county court, regarded and treated the fund as if the county court and not the individuals composing the court was the trustee. It is also certain that the donor, Mr. Anthony W. Rollins had the same idea in his mind when he made his will, for he speaks of it being "vested in said county court as a permanent fund," and directs "the county court of Boone county" to make annual reports to the board of curators of the State University.

Mr. Rollins evidently thought that there was some doubt about a county court having the power to act as trustee, and therefore by item 8 of his will spoke of the fund being vested in the county *court,* while in item 9 he spoke of it being vested in the *judges* of the county court. But the prevailing idea was that while he directed the fund to be paid over to the then judges and their successors, the court was to manage it. He intended it as a public charity for the poor youths of Boone county, and evidently selected the county court to manage the fund because that court had to deal officially with financial matters and with poor persons. The case of Chambers v. St. Louis, 29 Mo. 543, holding that a municipal corporation might be a trustee of

a charitable trust, had not then been decided, and it may have been for this reason or because Mr. Rollins saw a distinction between a municipal corporation, with its dual capacity, and a county court, with only a governmental capacity, that he expressed himself with such confusion in the will as to where the fund was to be vested. At any rate every one had for nearly a quarter of a century treated it as the business of the county court. The usual course of business acted upon, acquiesced in and sanctioned by all parties and by the community, had been for the court to treat it as a trust fund of the court, to be held by the county treasurer like other funds, and secured by his official bond, and these defendants only treated it as it had always been treated, and we think properly so.

In Tatum v. Holliday, 59 Mo. 422, WAGNER, J., held that where a sheriff was, by order of court, substituted as trustee in a deed of trust, he acted officially in making a sale, and his bondsmen were liable for a conversion of the proceeds, and that it was only in case some other person was substituted for the trustee that a bond is required. This was followed by NORTON, J., in State ex rel. v. Griffith, 63 Mo. 545, and by BAKEWELL, J., in State to use v. Taylor, 6 Mo. App. 277, and by SHERWOOD, J., in State ex rel. Chase v. Davis, 88 Mo. 585. The principle underlying this doctrine is that a public officer's bond is liable for all money that comes into his hands in his official capacity. The obligation of a sheriff's bond is, "for the faithful discharge of his duties" [R. S. 1889, sec. 8175], and his duties as prescribed by section 8185 do not expressly include acting as trustee under deeds of trust. The condition of a county treasurer's bond is, "for the faithful performance of the duties of his office" [R. S. 1889, sec. 3162], and by section 3165, he is required to "receive all moneys payable into the treasury thereof, and disburse the same on warrants drawn by order of the county court."

It not unfrequently happens that trust estates and funds get into courts, and in every such instance it is directed by the court to be turned over to the clerk of the court. The obligation of a clerk's bond is conditioned, "that he will faithfully perform the duties of his office, and pay over all moneys which may come to his hand by virtue of his office," etc. [R. S. 1889, sec. 1966.]

If a sheriff, substituted as trustee under sections 8683 and 8684, R. S. 1889, is not required to give a bond because he acts officially and his sureties are liable for his acts, and if a clerk of a court of record, who receives trust funds placed in his hands by order of the court, is liable on his bond therefor, it follows that a county treasurer who receives trust funds that are under the management of the county court, by order of that court, is likewise liable on his bond therefor.

When, therefore, the county court, in 1869, directed the Rollins bequest to be received by the county treasurer, it placed the trust funds in the only proper repository for funds that the county court had the management of, and in the hands of a public officer whose bond was responsible for the safe keeping of the fund and such treasurer acted officially in reference thereto. And when each retiring treasurer turned over the trust fund to the incoming treasurer, the latter took it officially and impressed with the original order of the court, and each treasurer's bond became security therefor.

The judges of the county court therefore performed their full duty when they placed the fund in the hands of the county treasurer, and they are not liable for a loss or misappropriation of the trust fund by the treasurer, any more than they would be for ordinary county funds. The remedy of plaintiffs in this case was complete against the sureties on the treasurer's bond.

It follows that the judgment of the circuit court must be reversed. It is so ordered. SHERWOOD and BRACE, JJ., concur. BURGESS, J., concurs, but places it on the ground that the county court is the real trustee, and that the judges as a court could only be held liable for malfeasance in office. WILLIAMS, J., having been of counsel did not sit and took no part herein.

GANTT, C. J. (dissenting):—I respectfully dissent from the opinion of my learned brother. "Item 8," of the will of Anthony W. Rollins, is in these words: "When my executors shall have raised the said sum of ten thousand dollars in the manner above specified, it is my will that they pay over the same to Alexander Persinger, Gilpin A. Tuttle and James C. Daley, justices of the county court of Boone county, or their successors in office, who may compose the county court of Boone county at the time, and that said fund shall remain with and be vested in said court as a permanent fund for the promotion of the object specified in the seventh item of the will above." He named the three gentlemen who were to constitute the first trustees and provided that, in case the fund was not raised during their incumbency, their successors in office who should compose the county court at the time the fund was raised, and their successors, should be his trustees to invest and distribute this charity. As I read it his purpose was, in this way, to secure a permanent set of trustees. The words "justices of the county court of Boone county" was a designation of their successors, equivalent to naming them by their proper names, a mere *designatio personae,* and the trust was not to be executed by them in their official characters but in their private and individual characters.

The county court as such was not invested with jurisdiction to receive and manage a private charity of this character, and it was no part of their public functions. The powers conferred upon the members of the court as indi-

viduals were derived from the will and not from the Constitution and laws of the State creating that court and defining their powers as such.

While it was entirely competent for Anthony Rollins to delegate to the persons named and their successors complete authority to regulate, control and dispose of his charity, I respectfully submit he could not confer upon the county court as a court a jurisdiction not conferred upon it by law. By his will he had created a trust and the county court had no equitable jurisdiction over said trust.

It seems to me that this conclusion necessarily results from the nature of these courts and well settled legal principles.

The decision of this court in Chambers v. St. Louis, 29 Mo. 543, in which Judge Scott with such signal ability maintained the power of the city of St. Louis as a municipal corporation to take property in trust for a charitable use does not in my opinion sustain the argument that like authority could be conferred upon the county court which is not given the powers from which Judge Scott evoked that right for the city.

In order to give effect to the intention of the testator, I think it should be held that the trust was confided to individuals and not a court incapable of accepting and executing the trust, and that their successors are provided for from time to time. Such is the theory of this action and such I think is also the view of the defendants themselves. The bill charged that the defendants became the trustees of this fund on January 1, 1887, and the circuit court found that they accepted the trust at that time. As I read the record no exception was saved to that finding and no complaint is made by appellants on that score. They admit that they held $40,339.89, which they offered to turn over to plaintiffs, their successors in said trust. The real issue

tendered was what was the true sum for which they were required' to account.

This brings us to the real contention in the case that of the measure of care which the law exacts of defendants in the administration of this trust fund so confided to them.

The defendants were elected judges of the county court in 1886, and entered upon their duties in the administration of this trust in January, 1887. It amounted at that time to $37,844.77. Prior to this time it is true the different county judges had constituted the county treasurer their financial agent and confided to his keeping the money and securities belonging to this trust.

On the first of January, 1887, Trimble, the outgoing treasurer turned over the above sum to Gillespy, the incoming treasurer.

That these defendants made no formal appointment of Gillespy as their agent is true but that they fully recognized him as their agent and answerable to them is certainly established by the testimony of defendant Roberts.

Their acquiescence in his action in that capacity must, under the circumstances, be held as effective as if they had made a formal appointment.

Their duty was plain, either to refuse to accept this trust, and ask a court of equity to appoint a trustee for this fund, or accept it and administer it with that degree of care that ordinarily prudent men would use in the conduct of their own business in a matter of this importance. Did they do this? The facts show that at the time Gillespy first received this fund he had good reputation for honesty and integrity. He was largely indebted and his property was encumbered by recorded deeds of trust nearly, if not quite, to the amount of their value.

But whatever this condition, defendants made no inquiry or examination into his financial condition.

It seems undeniable that Gillespy, while in charge of

these funds, kept them mingled with the county money in his hands, and deposited to his individual credit in bank and indiscriminately checked on the same for his private use, as well as in payment of public warrants.

No doubt can exist as to the measure of care exercised by defendants. It is shown by the testimony of defendant Roberts. He stated that the defendants never required a detailed statement of the condition of this fund during Gillespy's incumbency. They did not know and did not even inquire where he was keeping this fund.

Judge Angell's evidence was to the same effect.

About the close of Gillespy's first term he began selling off his land and at the close of his second term he was found to be wholly insolvent. Defendants then undertook to settle with Gillespy and took his note for $2,500 as a compromise. Granting that a trustee may employ an agent for some purposes, I can not agree that there was the slightest necessity for these trustees to delegate to Gillespy the keeping of this important fund. If it was necessary to keep it in bank for want of borrowers, it was their obvious duty to use their own discretion in selecting the bank or other depositary, using due diligence to see that it was deposited in an institution recognized as a solvent and safe bank.

Even if they found it convenient to have applications for this fund made to the treasurer there was no necessity for depositing the money with him. After the preliminaries of the loan had been arranged they could have given their check for the money.

Such is the general course of business. Ordinarily prudent men with money to loan do not turn over their money to their loan agents.

I can not escape the conclusion that these defendants regarded their duties as entirely formal. Surely such a view of their liability can not be sanctioned by the courts.

That their predecessors may have been equally loose in their management of this fund, does not excuse them.

It can not be maintained that a negligent course of management by one set of trustees shall establish a rule of conduct.

Without going into detail, I hold that the evidence discloses inexcusable negligence in committing this fund to Gillespy, because there was no necessity for so doing; that the trustees were negligent in not ascertaining his solvency before turning over to him this large sum of money; that their failure to require regular and frequent detailed reports of how the money was kept and where and the character of the depositaries was inexcusable. I can not agree that as county treasurer Gillespy had any right to this fund, nor that his sureties are liable for his default. His sole and only claim to handle it originated in the permission accorded by defendants and their acquiescence in his acting as the custodian thereof.

He was their agent, and for his default they should be held liable.

I think the judgment should be affirmed. ROBINSON, J., agrees in my views.